871 A.2d 590

MARYLAND MOTOR TRUCK ASSOCIATION WORKERS' COMPENSATION SELF–INSURANCE GROUP

v.

PROPERTY & CASUALTY INSURANCE GUARANTY CORP.

No. 95, Sept. Term, 2004.

Court of Appeals of Maryland.

April 6, 2005.

Severn E.S. Miller (Thomas & Libowitz, P.A., on brief), Baltimore, for appellant.

Albert J. Mezzanotte, Jr. (Emily A. Daneker, Whiteford, Taylor & Preston, L.L.P., on brief), Baltimore, for appellee.

Patricia McHugh Lambert, Ruth F. Vadi, Hodes, Ulman, Pessin & Katz, P.A., Towson, *amicus curiae* brief of Maryland Association of Boards of Education Workers' Compensation Group Self Insurance Fund, Maryland Restaurant Hospitality Self Insured Fund, Automobile Dealers' Group Self Insurance Trust, and MACS Workers' Compensation Self-Insurance Group.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

With exceptions not relevant here, Maryland Code, § 9–402 of the Labor and Employment Article (LE), which is part of the Workers' Compensation Law, requires every Maryland employer to secure workers' compensation for its covered employees and lists six possible methods by which that obligation may be satisfied:

(1) maintaining insurance with the Injured Workers' Insurance Fund;

(2) maintaining insurance with an authorized insurer;

(3) participating in a governmental self-insurance group;

(4) participating in a self-insurance group of private employers that meets the requirements of title 25, subtitle 3 of the Insurance Article (INS);

(5) maintaining individual self-insurance in accordance with LE § 9–405; or

(6) having a county board of education secure compensation under §§ 8–402(c) or 7–114(d) of the Education Article.

In 1993, a number of Maryland trucking companies decided to use the fourth method—a private self-insurance group. In that year, the Maryland Motor Truck Association (MMTA), a nonprofit trade organization, established the Maryland Motor Truck Association Workers' Compensation Self–Insurance Group (MMTA Group) for some of its members. In conformance with a regulation of the Insurance Commissioner, MMTA Group obtained a policy of excess insurance, for claims exceeding $150,000, from Reliance National Indemnity Company. That policy was renewed from time to time and was in effect for the period from February, 1999 to June, 2000. During that period, four claims exceeding $150,000 were filed against member trucking companies that were part of the MMTA Group, and the excess amounts with respect to those claims were submitted by MMTA Group to Reliance. Because of financial difficulties, Reliance was unable to pay those amounts. In October, 2001, Reliance was declared insolvent by a Pennsylvania court and ordered to liquidate.

In light of that circumstance, MMTA Group filed a claim with the Property and Casualty Insurance Guaranty Corporation (PCIGC), an entity established by the General Assembly to provide for the payment of claims covered by policies of property or casualty insurance companies that become insolvent. PCIGC denied the claim on the ground that it was not a "covered claim," as defined in INS § 9–301(d). In taking that position, PCIGC ultimately relied on § 9–301(d)(2)(i), which provides that "[c]overed claim" does not include an amount due an "insurer." It asserted that MMTA Group was an "insurer," within the meaning of that word as used in § 9–301(d)(2)(i).

That is the issue before us. The Circuit Court for Baltimore County, in a declaratory judgment and breach of contract action filed by MMTA Group against PCIGC, declared that MMTA Group was an "insurer" and granted PCIGC's motion for summary judgment, whereupon MMTA Group

appealed to the Court of Special Appeals. We granted *certiorari* on our own initiative prior to proceedings in the intermediate appellate court and shall affirm.

## BACKGROUND

### *Self–Insurance Groups and MMTA Group*

As noted, LE § 9–402(a) permits employers to comply with the requirement of providing workers' compensation to their covered employees by "participating in a self-insurance group of private employers that meets the requirements of Title 25, Subtitle 3 of the Insurance Article." That authority is repeated in INS § 25–302.

INS Title 25, subtitle 3 consists of §§ 25–301 through 25–308. Those sections place these self-insurance groups under the jurisdiction of, and subject to extensive regulation by, the Insurance Commissioner. Section 25–303 requires the Insurance Commissioner to adopt regulations to implement the subtitle, regulations that must include, among other things:

"(1) classifications of business and industries, based on the type of activity conducted ... within which employers may join together in self-insurance groups;

(2) for each classification:

(i) a minimum level of contribution of at least $250,000 in premiums collected from or pledged by the members of the group to a fund from which workers' compensation claims will be paid;

(ii) a minimum level of excess insurance coverage that must be obtained by each self-insurance group;

\*　　\*　　\*

(3) conditions under which contributions by members of a self-insurance group may be rebated or temporarily suspended; [and]

\*　　\*　　\*

(5) a requirement that the governance of the group be under the control of its members."

Section 25–304(a) requires approval by the Commissioner before a self-insurance group may operate, and that includes approval of the self-insurance agreement. Section 25–306 requires approval by the Commissioner of any termination of a self-insurance agreement as well as any merger between two or more such groups. Section 25–307 permits the Commissioner to require actuarial studies and audits to determine the financial solvency of each group, to assess the group up to $500 to defray the cost of such reports and audits, and to require from a self-insurance group an annual report that may include payroll audit reports, summary loss reports, and quarterly financial statements. Section 25–308 authorizes the Commissioner to impose on self-insurance groups a monetary penalty up to $10,000 for violations of the subtitle, to issue cease and desist orders to preclude those groups from engaging in practices that the Commissioner finds in violation of the subtitle, and to suspend or revoke the authority of the group to operate.

Section 25–304(b) requires each self-insurance group to have combined assets of at least $1,000,000. Section 25–304(c) requires the group to pay all workers' compensation benefits for which each member incurs liability during the period of membership. It makes each member jointly and severally liable for the workers' compensation obligations of the group and its members that are incurred during its period of membership, and it provides that the joint and several liability continues even if an employer's membership is terminated or cancelled.

In accord with these statutory provisions, the Insurance Commissioner has promulgated a set of regulations dealing with private self-insurance groups. They are found in COMAR 31.08.09. They prescribe the kinds of businesses that may form self-insurance groups (31.08.09.03); they specify the minimum "annual premium" that must be collected by the group from its members (31.08.09.04); they require each group to maintain excess insurance coverage of at least $1,000,000 per occurrence over a retention of $350,000 or less and set some requirements for excess insurance policies

(31.08.09.06); and they provide detailed requirements for an application for certificate of authority to operate as a self-insurance group, including "a schedule for the collection of premiums," procedures for handling disputes "regarding premium payments by member," and "[p]roof of payment to the group by each member of not less than 25 percent of that member's first year estimated annual net premium." (31.08.09.07).

The regulations authorize the Commissioner to "make an examination of the affairs, transactions, records, and assets of any group as often as the Commissioner deems necessary to determine the group's financial solvency." (31.08.09.11). They require each group to submit to the Commissioner an audited annual financial statement showing:

"(1) Actuarial appropriate reserves for:

(a) Known claims and expenses associated with them,

(b) Claims incurred but not reported and expenses associated with them,

(c) Unearned premiums, and

(d) Bad debts, which reserves shall be shown as liabilities; [and]

(2) An actuarial opinion regarding reserves for:

(a) Known claims and expenses associated with them, and

(b) Claims incurred but not reported and expenses associated with them[.]"

(31.08.09.12).

The MMTA Group was formed on July 1, 1993, with the execution of a Trust and Indemnity Agreement. The purpose of the Group, as stated in the Agreement, was to provide economical Workers' Compensation and Employers' Liability Insurance coverage for the Members of the Group, to reduce the amount and frequency of losses, and to do all necessary and proper things incident to the provision of Workers' Compensation and Employers' Liability Insurance in such manner as to be in the best interest of the Members of the Group. The Agreement created a trust, provided for its funding,

operation, and governance, and set forth the obligations of the members of the group.

The trust was to be funded by "premiums" paid by the members of the Group in amounts established by the Board of Trustees. §§ 3.04, 3.05. Those premiums were to be placed into two separate funds created by the Agreement: a Trustees' Fund, to deal with administrative costs, and a Claims Fund, for the purpose of paying claims and claim costs. § 5.02. The Group was required to defend, in the name and on behalf of its members, any claim, suit, or other proceeding instituted against the member on account of injuries or death covered by the Workers' Compensation Law or Employers' Liability, or otherwise asserting the member's liability under the Workers' Compensation Law. § 10.08. In the event of a deficit, the trustees were authorized to adopt a plan for elimination of the deficit, including an assessment on all members in the proportion which the contribution (annual premium) of each bears to the total contribution of all. § 5.05. In the event of insolvency of the Group, each member was jointly and severally liable for the liabilities and obligations of all members. § 3.05(a).

The calculation of premiums was provided for in the By-Laws of the Group. The aggregate premium needed was to be determined by the Board of Trustees. The premium for each member was to be determined by the Administrator, appointed by the trustees, based on the member's loss experience for prior years. In accordance with statutory and regulatory requirements and with § 5.06 of the Agreement, the trustees were required to obtain excess insurance in an amount not less than $1,000,000 over a retention of $250,000.

Both the Agreement and the By-Laws permitted the trustees to employ a Service Company to handle claims made against the members and perform other administrative services. Article X, § 2 of the By-Laws provided, among other things, that the Service Company was to handle all claims after notice of injury was given, to prepare all required Workers' Compensation forms, provide a defense if deemed

appropriate, and negotiate with a member's injured employee or the employee's attorney.

### PCIGC and Self–Insurers' Guaranty Fund

Title 9 of the Insurance Article deals with insurance companies that are in financial difficulty. In subtitle 3 of that title (INS §§ 9–301 through 9–316), the Legislature created and provided for the operation of PCIGC. The corporation is created by § 9–304 as a private, nonprofit, nonstock corporation. That section requires each authorized insurer that writes any kind of direct insurance not specifically excluded from the ambit of the statute to be a member of PCIGC.[1] Subject to certain conditions and limitations set forth in § 9–306, PCIGC is obligated to pay "covered claims," including the full amount of any covered claim arising out of a workers' compensation policy. In order to fulfill that obligation, PCIGC is required (1) to create separate accounts for title insurance, motor vehicle insurance, workers' compensation insurance, and other insurance to which the subtitle applies and (2) to assess each of its members in the proportion that the member's net direct written premiums for the preceding calendar year on the kinds of insurance covered by the appropriate account bears to the net direct written premiums of all member insurers for that year on those kinds of insurance.

PCIGC, as noted, is liable only for the payment of a "covered claim." That term is defined generally in INS § 9–

---

1. INS § 9–304(b) provides that, "[a]s a condition of its authority to transact insurance business in the State, each member insurer must be and remain a member of the Corporation." Section 9–301(f) defines "Member insurer" as "an authorized insurer that writes a kind of insurance . . . to which this subtitle applies." Section 9–303 states that the subtitle applies to "all kinds of direct insurance" except those enumerated in that section. Insurance for workers' compensation claims is not within any of the exceptions. The closest that any exception comes to a self-insurance group is that for insurance written by a "risk retention group." The term "risk retention group" is defined in § 25–101(j) of the Insurance Article and, as so defined, it would not include a self-insurance group organized under title 25, subtitle 3, and no party to this action has claimed otherwise.

301(d)(1) as including an insolvent insurer's unpaid obligation that arises out of a policy of the insolvent insurer. There is no dispute that Reliance qualifies as an insolvent insurer for purposes of that definition. Section 9–301(d)(2), however, provides that "covered claim" does *not* include "an amount due to a reinsurer, *insurer*, insurance pool, or underwriting association, as a subrogation recovery or otherwise." (Emphasis added).

In addition to PCIGC, the Legislature created, as part of title 25, subtitle 3 of the Insurance Article, dealing with workers' compensation self-insurance groups, the Self Insurers' Guaranty Fund (SIGF). Section 25–305 creates that Fund and provides for its administration by the Uninsured Employer's Fund established by LE § 10–304. The purpose of SIGF is to pay outstanding obligations of a self-insurance group that becomes insolvent. Each self-insurance group is required to pay an assessment to SIGF "at the same level assessed against other workers' compensation carriers by [PCIGC] under Title 9, Subtitle 3 of this article," INS § 25–305(d), but, as the *quid* for that *quo*, self-insurance groups "[are] not liable for payments to [PCIGC]," § 25–305(a).

## DISCUSSION

MMTA Group makes three points in support of its assertion that it is not an "insurer" for purposes of INS § 9–301(d)(2)(i). First, relying on *CSX v. Continental Insurance,* 343 Md. 216, 680 A.2d 1082 (1996) and cases from other States, it urges that, by definition, self-insurance is not insurance, and, since it is not insurance, a self-insurance group cannot be an insurer. That conclusion, it adds, is supported by the definition of "insurer" in INS § 1–101(v): " 'Insurer' includes each person engaged as indemnitor, surety, or contractor in the business of entering into insurance contracts." MMTA Group does not enter into "insurance contracts," it says. Finally, it notes that there are two out-of-State decisions on this issue—one in Iowa (*Iowa Cont. Wkrs' Comp. v. Iowa Ins. Guar.,* 437 N.W.2d 909 (Iowa 1989)), which is in its favor, and one in South Carolina (*S.C. Prop. & Cas. v. Carolinas Roofing Fund,* 315 S.C.555,

446 S.E.2d 422 (1994)), which is not—and it urges that we follow the Iowa approach and reject the South Carolina view. Not surprisingly, PCIGC finds the South Carolina case more relevant and persuasive and believes that it is more consistent with Maryland law.

The issue *is* one of statutory construction—the meaning of the word "insurer" in INS § 9–301(d)(2)(i)—and our objective is therefore to determine whether the Legislature intended that word to include self-insurance groups formed under LE § 9–402(a)(4) and INS title 25, subtitle 3. If the language of the statute is clear and unambiguous and, of itself, leads to but one result, there is no need to look further. If that is not the case, however, we must search further for the legislative intent by applying the most relevant of the various established canons. In the context at issue here, the word itself is *not* so clear and unambiguous as, by itself, to make the legislative intent patent. That intent—whether self-insurance groups such as MMTA Group are eligible to make claims against PCIGC—is not apparent to us solely from the word "insurer." Clearly, the claim of an "insurer" is not a "covered claim." The issue is whether the Legislature intended that self-insurance groups such as MMTA Group be regarded as "insurers" for that purpose, and that intent can only be found in the broader scheme fashioned by the Legislature, including the laws dealing with self-insurance groups, with PCIGC, and with SIGF.

We consider first MMTA Group's argument that self-insurance is not insurance. For that proposition, as noted, MMTA Group cites *CSX v. Continental Insurance, supra,* 343 Md. 216, 680 A.2d 1082 and some out-of-State cases. We made no such holding or declaration in *CSX.* In a footnote, we simply described the nature of a self-insured retention, but said nothing as to whether such a retention constitutes insurance. *See id.* at 221–22, n. 4, 680 A.2d at 1086, n. 4. Indeed, at least with respect to self-insurance under the compulsory motor vehicle insurance laws, we have observed that self-insurance has been recognized by the General Assembly "as the equivalent of an insurance policy." *West American v. Popa,* 352 Md.

455, 475, 723 A.2d 1, 11 (1998); *BGE Home Products & Services, Inc. v. Owens,* 377 Md. 236, 246–47, 833 A.2d 8, 14 (2003).

When dealing with an individual policyholder who elects, or is required by deductibles or policy limits of one kind or another, to retain the risk for some part of a loss, the question of whether that retained risk constitutes "insurance" is, to some extent, a matter of semantics: is the policyholder *self*-insured or *non*-insured for that risk? In reality, because in that situation there is no spreading of the risk for that part of a loss that is either within a deductible or over the policy limit, the policyholder is more likely *non*-insured for that segment. As we shall explain later, that is not necessarily the case with group self-insurance. There, the retained risk is transferred from the individual (member) to the group and is spread throughout the group. The member may share with the other members joint and several liability for the overall, aggregate obligations of the group, but it is relieved of any direct obligation for payment of particular claims made against it. That is much more akin to the nature and concept of insurance than to that of non-insurance.

Both the Iowa and South Carolina cases addressed, in the context of their respective laws, the issue now before us— whether a workers' compensation self-insurance group was barred from pursuing a claim against a guaranty fund following the insolvency of its excess insurance carrier, on the ground that the group was an "insurer." Although both cases are distinguishable in one way or another, we find that the decision in the South Carolina case is more consistent with underlying Maryland law than that rendered by the Iowa court.

The Iowa court allowed the claim on three grounds: its construction of the relevant Iowa statute, certain regulations adopted by the Iowa Insurance Commissioner, and its perception of the extent of risk transference achieved by the self-insurance agreement under consideration. The court first pointed out that the term "insurer" was defined in the Iowa

law as "an insurer *licensed* to transact business in this state under either chapter 515 or chapter 520. . . ." (Emphasis added) (internal citation omitted) *Iowa Cont. Wkrs' Comp. v. Iowa Ins. Guar., supra,* 437 N.W.2d at 915. The court regarded that definition as a narrow one and, in holding the self-insurance group not to be an "insurer," noted that the group was not licensed (or apparently required to be licensed) under either chapter. The court's point was that "[t]he legislature may be its own lexicographer, and when it chooses to do so we are bound by its definitions." *Id.* The Maryland statutory definition of "insurer" is different. It says nothing about licensure, but includes persons "engaged as indemnitor, surety, or contractor in the business of entering into insurance contracts." If the entity does that, it is an insurer. The Iowa court also observed that the statute dealing with the guaranty corporation specifically excluded from the definition of a "covered claim" the "self-insured portion of the claim," which the court treated as including, at least by implication, a claim by a self-insured entity, whose claim would not be a "self-insured portion." Maryland does not have such a provision.

The regulations relied upon by the Iowa court expressly stated that workers' compensation self-insurance groups were not deemed to be insurance companies, were not subject to the provisions of the insurance laws, and were not subject to the premium tax on direct insurance. The Iowa Legislature later codified that exemption from the premium tax. No such regulations exist in Maryland. To the contrary, as noted, self-insurance groups are subject to extensive regulation by the Insurance Commissioner. Although MMTA Group asserted in its brief, without contradiction, that self-insurance groups do not pay the premium tax levied under INS § 6–102, it does not appear that their exemption from that tax has ever been litigated or approved by an opinion of the Attorney General and it is not expressly provided for in the statute. Section 6–101(a) subjects to the tax any person "engaged as principal in the business of writing insurance contracts, surety contracts, guaranty contracts, or annuity contracts." Section 6–101(b) lists entities that might otherwise fall within the ambit of § 6–

101(a) but that are exempt from the tax. Self-insurance groups are not in that list. We need not decide that issue in this case but note only that the exemption of workers' compensation self-insurance groups from the premium tax in Maryland is much less clear than it was in Iowa.

Finally, the Iowa court rejected the Guaranty Association's view that, because the self-insurance agreement involved a measure of risk transference, it necessarily constituted insurance. Citing KEETON, INSURANCE LAW 6 (1971), the court concluded that not all risk transference constitutes insurance and that, in any event, there was not a complete transference, as each member of the self-insurance group remained jointly and severally liable for both claims against it and claims against the other members.

The South Carolina law, at issue in *S.C. Prop. & Cas.*, was, in some respects, similar to that in Iowa. The statute authorizing workers' compensation self-insurance groups provided that those groups were subject to the exclusive jurisdiction of the Workers' Compensation Commission, that they were not deemed to be *insurance companies*, and that they were not regulated by the Department of Insurance. Nonetheless, the South Carolina Supreme Court sustained a lower court conclusion that the group was an "insurer" as that term was used in the definition of "covered claim."

The trial court rested its decision largely on a finding that the self-insurance agreement involved a significant degree of risk transference, sufficient to meet the conceptual definition of insurance. The appellate court agreed but noted as well that the South Carolina law defined "insurer" as including any association engaging as principal in any kind of insurance or surety business and that it defined "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." The court found that, under those definitions, the group qualified as an "insurer."

As we observed, INS § 1–101(v) defines "insurer" as "each person engaged as indemnitor, surety, or contractor in the

business of entering into insurance contracts." To some extent, that begs the question, of whether the self-insurance agreement at issue constitutes an "insurance contract." If so, MMTA is clearly an "insurer," as its sole *raison d'etre* and its only business is to enter into that kind of contract. In determining whether the Agreement constitutes an insurance contract, we must look at what it *says* and what it *does*.

The nomenclature used in the Agreement—what the Agreement *says*—indicates that it is, and was perceived by the parties to be, an insurance contract. Throughout the Agreement and the accompanying By–Laws, words closely associated with, and in many respects peculiar to, insurance are used. The payments required from the member employers are referred to consistently as "premiums." The Agreement covers not just workers' compensation claims but also other employer's liability, and that aspect is directly referred to as "insurance." In a broader sense, § 7.01 of the Agreement states expressly that "[t]he purpose and objective of the Group is to provide economical Workers' Compensation and Employers' Liability *Insurance coverage* for the Members of the Group ... and to do all necessary and proper things incident to the provision of Workers' Compensation and Employers' Liability Insurance in such manner as to be in the best interest of the members of the Group." (Emphasis added). Article VII of the By–Laws sets forth "Underwriting Guidelines" to be used in determining the "premiums" to be paid by the member employers. The Agreement and the By–Laws refer to the purchase of "excess insurance"—not just insurance—to protect the member employers, suggesting that what the MMTA Group provides is primary insurance.

Some of the nomenclature used in the Agreement and By–Laws mirrors that used by the Legislature in the statute and the Insurance Commissioner in his regulations. As we have observed, both the statute and the regulations characterize the payments made by the member employers as "premiums," both refer to the required purchase of "excess insurance," and both speak of "actuarial" studies, audits, and opinions.

The substance of the Agreement—what it *does*—is fully consistent with that nomenclature. Although the Iowa court was correct in noting that not all risk transference necessarily constitutes insurance, it is well recognized that risk transference and risk distribution are prime characteristics of insurance. *See* 1 COUCH ON INSURANCE § 1.9 (3d ed. 2004) ("It is characteristic of insurance that a number of risks are accepted, some of which will involve losses, and that such losses are spread over all the risks in a way that enables the insurer to accept each risk at a slight fraction of the possible liability upon it"); KENNETH S. ABRAHAM, DISTRIBUTING RISK: INSURANCE, LEGAL THEORY, AND PUBLIC POLICY at 2 (1986) ("By paying a relatively small sum—the insurance premium—the insured policyholder receives a promise from an insurance company to pay the insured if he or she suffers a loss. The insured avoids the risk of suffering a large loss by substituting the certainty of suffering a small one.").

The Agreement clearly provides for that kind of risk transference and distribution. All claims made against a member employer are investigated, adjusted, settled, litigated, and, if necessary, paid by MMTA Group, not by the member. In return for the premiums paid by the member, it has transferred to the Group its liability for the payment of claims made against it. *See* INS § 25–304(c)(1): "A self-insurance group shall pay all workers' compensation benefits for which each member incurs liability during its period of membership." Should the Group become insolvent and unable to discharge that duty, the member may make a claim against SIGF, the separate entity created by the Legislature for that very eventuality.

The mere fact that the members retain joint and several liability for any remaining obligations of the Group does not suffice to preclude the Agreement from constituting an insurance contract. Section 504 of the Agreement also provides for the distribution of surplus funds, not needed for the payment of claims and administrative expenses or for a prudent cushion, to the members in the form of dividends. Such an arrangement—joint and several liability for a deficiency and

the right to recover part of the surplus funds in the form of dividends—is a traditional characteristic of assessment mutual insurance companies. Although, by statute, the Maryland Legislature has limited the liability of assessment mutual insurance company members (*see* INS § 3–111(c)(2)), the retained contingent liability of mutual insurance company members for assessments to make up any deficiency in the ability of the company to pay accumulated claims (along with their concomitant right to dividends in the event the company earns more than is required to pay those claims) is a common element of those kinds of insurance companies.

When we consider this entire landscape, it seems clear that these workers' compensation self-insurance groups fall well within the definition of "insurer" in INS § 1–101(v) and well within the meaning of "insurer" as used in INS § 9–301(d)(2)(i). The Circuit Court was therefore correct in holding that the claim made by MMTA Group was not a "covered claim" within the meaning of § 9–301(d)(2)(i) and entering judgment accordingly.

**JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED, WITH COSTS.**