Merrimack
No. 2006-003

NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION EMPLOYEE BENEFIT TRUST

v.

NEW HAMPSHIRE INSURANCE GUARANTY ASSOCIATION & a.

Argued: September 12, 2006
Opinion Issued: December 21, 2006

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*James Q. Shirley* on the brief and orally), for the petitioner.

*Nixon Peabody LLP*, of Manchester (*John E. Friberg, Jr. & a.* on the brief, and *Mark D. Robins* orally), for respondent New Hampshire Insurance Guaranty Association.

*Orr and Reno, P.A.*, of Concord (*Lisa Snow Wade* on the brief and orally), for respondent New Hampshire Life and Health Insurance Guaranty Association.

BRODERICK, C.J. The petitioner, New Hampshire Motor Transport Association Employee Benefit Trust (Trust), appeals an order of the Superior Court (*Fitzgerald*, J.) denying its motions for summary judgment and granting the summary judgment motions of the respondents, New Hampshire Insurance Guaranty Association (NHIGA) and New Hampshire Life and Health Insurance Guaranty Association (NHLHIGA). The trial court ruled that neither NHIGA nor NHLHIGA was obligated to cover claims that the Trust's insolvent insurer was unable to pay because the Trust itself was an insurer and because the policy under which the

Trust's unpaid claims arose was for reinsurance rather than direct insurance. We affirm.

The facts are not in dispute. The Trust is a non-profit multiple-employer welfare arrangement (arrangement) organized under the federal Employee Retirement Income Security Act of 1983 and RSA chapter 415-E (2006). Its purpose is to provide a health care benefit program for the employees of members of the New Hampshire Motor Transport Association. The Trust is administered by Anthem Blue Cross and Blue Shield. Each member employer pays into the Trust a fixed amount per employee, and all employers pay the same amount per employee, regardless of their individual claim histories. The money is deposited into a pooled account, which is used to pay claims submitted by or on behalf of those covered by the Trust and to cover the Trust's administrative expenses. If, in a given year, employer contributions exceed the amount needed to cover administrative expenses and pay claims, the surplus is used to reduce the amount that Trust members are required to contribute the following year. On the other hand, if claims exceed the amount the Trust has collected from its members in a given year, the members are required to make additional contributions, based upon the number of employees they have, to cover the shortfall.

By statute, "[e]ach arrangement shall maintain specific excess insurance with a retention level determined in accordance with sound actuarial principles and approved by the commissioner [of insurance]." RSA 415-E:3, III. To meet that statutory requirement, the Trust purchased a policy of specific excess loss insurance from Legion Insurance Company (Legion). Under the policy, the Trust was responsible for the first $125,000 of every claim for health benefits submitted to it. For any claim that exceeded that amount, the Trust was to pay benefits in the first instance, subject to full reimbursement from Legion up to a lifetime maximum of $4,875,000 per covered person.

In April 2002, Legion was placed into rehabilitation by the Pennsylvania Commonwealth Court, and in July 2003, that court entered an order of liquidation. When Legion was placed into rehabilitation, it owed the Trust approximately $412,971 in unpaid claims. After the Pennsylvania court entered its order of liquidation, the Trust asked both NHIGA and NHLHIGA to assume responsibility for those unpaid claims. NHIGA declined on the ground that the New Hampshire Insurance Guaranty Association Act (Guaranty Act), RSA chapter 404-B (2006), does not provide coverage for policies of life and health insurance, and NHLHIGA declined on the ground that "a stop-loss group insurance plan is not a covered product" under the New Hampshire Life and Health Insurance Guaranty Association Act (Life & Health Guaranty Act), RSA chapter 408-

B (2006). The Trust then filed a declaratory judgment petition, and all parties moved for summary judgment.

In its motion for summary judgment, NHIGA argued, *inter alia*, that: (1) the Legion policy was not direct insurance, and is thus excluded from coverage under the Guaranty Act by RSA 404-B:3; and (2) the Trust's claims against Legion were not "covered claims" under RSA 404-B:5, IV because they were for amounts due an insurer. The trial court agreed.

In its motion for summary judgment, NHLHIGA argued, *inter alia*, that it had no obligation to cover the Legion policy because the Trust's claims arose from a policy of reinsurance, thus excluding them from coverage under RSA 408-B:5, II(b)(2). The trial court agreed. This appeal followed.

We review the trial court's application of the law to the facts *de novo*. *Belanger v. MMG Ins. Co.*, 153 N.H. 584, 586 (2006). Like the trial court, we begin with the Trust's arguments for coverage from NHIGA under the Guaranty Act, and then discuss the Trust's argument for coverage from NHLHIGA under the Life & Health Guaranty Act.

I

The purpose of the Guaranty Act is "to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . . and to provide an association to assess the cost of such protection among insurers." RSA 404-B:2. Moreover, chapter 404-B "shall be liberally construed to effect the purpose under RSA 404-B:2." RSA 404-B:4. However, "[t]he statutory framework of NHIGA prevents it from becoming a substitute insurer," *Benson v. N.H. Ins. Guaranty Assoc.*, 151 N.H. 590, 598 (2004), and the protection provided by NHIGA is limited in a variety of ways, *see id.* at 598-99. For example, NHIGA is obligated to pay only "covered claims," RSA 404-B:8, I(a)-(b), a category that excludes "any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise," RSA 404-B:5, IV.

The Trust conceded at oral argument that if we determine it to be an insurer, it has no claim against NHIGA, and so we begin with that issue. To resolve it, we must construe the term "insurer" as used in RSA 404-B:5, IV. In matters of statutory interpretation, we are, the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *Debonis v. Warden, N.H. State Prison*, 153 N.H. 603, 605 (2006). We interpret statutes in the context of the overall statutory scheme and not in isolation. *City of Rochester v. Corpening*, 153 N.H. 571, 573 (2006).

■ Chapter 404-B defines the terms "insolvent insurer" and "member insurer," *see* RSA 404-B:5, V-VI, but because those definitions pertain to providers of insurance whose policyholders might be protected by the Guaranty Act rather than to potential recipients of payments from NHIGA, they do not aid us in construing the term "insurer" in RSA 404-B:5, IV. The statute, in fact, does not define the term "insurer." When statutory terms are undefined, we ascribe to them their plain and ordinary meaning. *Appeal of Town of Nottingham*, 153 N.H. 539, 553 (2006). In common usage, an "insurer" is "one that contracts to indemnify another by way of insurance." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1173 (unabridged ed. 2002). The common definition of "insurance" includes both "the action or process of insuring ... against loss or damage by a contingent event (as death, fire, accident, or sickness)," *id.*, and "a device for the elimination or reduction of an economic risk common to all members of a large group and employing a system of equitable contributions out of which losses are paid," *id.* Based upon the stipulated facts concerning the operation of the Trust and the common definition of the term "insurer," we concur with the trial court's determination that the Trust is an insurer. The Trust insures its members' employees against the risk of illness and injury by collecting contributions from its members and paying claims out of those contributions. That makes the Trust an insurer.

Our conclusion is consistent with the statutory scheme governing the Trust's operations as an arrangement. Arrangements such as the Trust are regulated under RSA chapter 415-E and are "established or maintained for the purpose of offering or providing health benefits." RSA 415-E:1, I. For the purposes of RSA chapter 415-A (2006), which pertains to standards for accident and health insurance, "multiple-employer welfare arrangements ... shall be deemed to be engaged in the business of insurance." RSA 415-A:1, I. Thus, with regard to the Trust's core function, providing health benefits to the employees of its members, the Trust has been deemed by the legislature to be engaged in the business of insurance.

To support its argument that it is not an insurer, the Trust identifies a number of statutory requirements pertaining to insurance companies to which it is not subject, such as licensure by the insurance department, registration with the National Association of Insurance Commissioners, payment of premium taxes, and the like. However, the question before us is not whether the Trust is an insurance company properly qualified to sell policies to members of the public; we are faced with the broader question of whether the Trust is an insurer. Whether or not the Trust is an insurance company, it does insure the employees of its members against the risk of illness and injury, and that is sufficient, under our plain-meaning analysis, to make it an insurer for the purposes of RSA 404-B:5,

IV. That statute bars payments due insurers, not payments due licensed insurers or insurance companies, and we will not add words to the statute that the legislature did not see fit to include. *See Debonis*, 153 N.H. at 605.

The Trust also relies upon our opinion in *Marshall v. Keene State College*, 147 N.H. 215 (2001). In that case, we held that Keene State College (KSC), which maintained a self-funded employee benefit plan, was not an insurer for purposes of RSA 417-E:1 (1998). *Marshall*, 147 N.H. at 218. However, the statutory language we construed in that case made RSA chapter 417-E applicable to "each insurer that issues or renews any policy of group or blanket accident or health insurance," *id.* at 217 (quotation and citation omitted), and our decision was based upon the fact that KSC did not issue or renew any policies of group or blanket accident or health insurance, *id.* at 217-18. *Marshall* is inapplicable to our analysis in this case because RSA 404-B:5, IV does not qualify the term "insurer" in the same way as the statute in *Marshall* qualified that term.

The Trust further argues that because arrangements that do not fully insure themselves are required by statute to purchase excess insurance, it is implausible that the legislature intended for arrangements such as the Trust not to enjoy the protection of the Guaranty Act. While that argument has an initial appeal, implicating, as it does, notions of equity and fundamental fairness, it has little support in the Act itself. RSA 404-B:5, IV could have been drafted to exclude payments of amounts due insurers except for arrangements required to purchase excess insurance, but it was not, and it is not our function to add provisions to the statute that the legislature did not see fit to include. *Nottingham*, 153 N.H. at 546. Moreover, a construction of the term "insurer" that places the burden of Legion's insolvency upon the Trust is not out of character with the provisions of RSA chapter 404-B that: (1) exclude amounts due to reinsurers, insurance pools, or underwriting associations from the definition of "covered claim," RSA 404-B:5, IV; (2) generally limit NHIGA's obligation to "covered claims existing prior to the determination of insolvency and arising within 30 days after the determination of insolvency," RSA 404-B:8, I(a); and (3) limit the amount of NHIGA's obligation to $300,000, regardless of the actual amount of the covered claim, *id.* In short, "[t]he protection [NHIGA] provides is limited based upon its status as a nonprofit entity and the method by which it is funded." *Benson*, 151 N.H. at 598.

The Trust devotes considerable attention to two out-of-state cases, *Iowa Contractors Workers' Compensation Group v. Iowa Insurance Guaranty Assoc.*, 437 N.W.2d 909 (Iowa 1989), and *Maryland Motor Truck Assoc. Workers' Compensation Self-Insurance Group v. Property & Casualty Insurance Guaranty Corp.*, 871 A.2d 590 (Md. 2005), arguing that we

should follow *Iowa Contractors* rather than *Maryland Motor Truck* and hold that the Trust is not an insurer. The respondents, in turn, contend that *Maryland Motor Truck* is the better reasoned opinion. Notwithstanding the trial court's reliance upon *Maryland Motor Truck* and the parties' arguments over which case we should follow, we find neither opinion particularly instructive.

Both *Iowa Contractors* and *Maryland Motor Truck* involved self-insurance groups, composed of employers, that protected their members from their own "risks of adverse workers' compensation claims," *Iowa Contractors*, 437 N.W.2d at 917; *see Maryland Motor Truck*, 871 A.2d at 591; *see also King-Jennings v. Liberty Mut. Ins. Co.*, 144 N.H. 559, 561 (1999) (explaining that "[a]n employer obtains workers' compensation insurance . . . in order to avoid personal liability for workers' compensation benefits that would be due to an employee who suffers a work related injury"). Here, by contrast, the risk insured against is not any risk of a Trust member, but rather the risks of the members' employees. Given the fundamental difference between one or more employers self-insuring against the risk of workers' compensation claims and an employer's participating in an arrangement to provide its employees with coverage against their own risks of illness and injury, the most that can be said, based upon *Iowa Contractors* and *Maryland Motor Truck* is as follows: If New Hampshire law were to regard a workers' compensation self-insurance group as an insurer, then the Trust, which provides coverage for the risks of its members' employees, would clearly qualify as an insurer. But if New Hampshire law were to follow *Iowa Contractors*, and consider a workers' compensation self-insurance group not to be an insurer, that would not be determinative of the status of the Trust, which, unlike a workers' compensation self-insurance group, does not provide coverage for its own risks.

We conclude our discussion of the Guaranty Act by addressing the Trust's reliance upon RSA 404-B:4, the Guaranty Act's liberal construction provision. We are, of course, obligated to follow that statutory mandate, but our power to liberally construe a statute extends only to the extent that the statutory language reasonably allows. *See Appeal of Cote*, 144 N.H. 126, 130 (1999). In this case, the statutory language does not reasonably allow the determination that the Trust is not an insurer.

Because the trial court correctly determined that the Trust is an insurer for the purposes of RSA 404-B:5, IV, we affirm its grant of summary judgment in favor of NHIGA.

## II

■ The purpose of the Life & Health Guaranty Act "is to protect, subject to certain limitations, the persons specified in RSA 408-B:5, I against failure in the performance of contractual obligations, under life and health insurance policies ... because of the impairment or insolvency of the member insurer that issued the policies or contracts." RSA 408-B:2, I. Like the Guaranty Act, the Life & Health Guaranty Act is to "be liberally construed to effect the purpose under RSA 408-B:2." RSA 408-B:3. According to the coverage and limitations section of chapter 408-B:

> This chapter shall provide coverage to the persons specified in paragraph I for direct, non-group life, health, annuity, and supplemental policies or contracts, for certificates under direct group policies and contracts, and for unallocated annuity contracts issued by member insurers, except as limited by this chapter.

RSA 408-B:5, II(a). NHLHIGA contends, *inter alia*, that it was not obligated to cover the Trust's unpaid claims against Legion because excess loss insurance is not a covered product under RSA 408-B:5, II(a). We agree.

The Trust's only argument for coverage under the Life & Health Guaranty Act is that if its Legion policy was a policy of health insurance, as NHIGA suggested in its rejection letter and argued in its brief, then NHLHIGA is obligated to cover its claims under that policy.

NHLHIGA provides coverage for direct health insurance policies. *See* RSA 408-B:5, II(a). While chapter 408-B does not define the term "health insurance," we have no difficulty concluding that the specific excess loss policy Legion issued the Trust was not a direct health insurance policy. Under that policy, Legion insured the Trust. The risk the policy insured against was the Trust's direct risk of claims against it in excess of $125,000. *See United Food & Commercial Workers v. Pacyga*, 801 F.2d 1157, 1161-62 (9th Cir. 1986) (explaining, in ERISA preemption context, that employee benefit plan's excess loss insurance was not health insurance and provided no coverage to plan participants, who were insured by the plan, not by the excess loss carrier). Of course, claims against the Trust necessarily arise from illness or injury suffered by the Trust's members' employees, but because the Trust itself was not insured against its own illness or injury, its policy from Legion was not a direct health insurance policy. *See Cuttle v. Federal Employees Metal Trades Council*, 623 F. Supp. 1154, 1157 (D. Me. 1985) (explaining, in ERISA preemption context, that employee benefit plan's excess loss insurance directly

benefited plan itself and only indirectly benefited plan participants who received health insurance under the plan).

The Trust argues that its Legion policy was health insurance because RSA chapter 404-G:2, VII (2006) includes "group excess loss insurance" within its definition of "health insurance." However, that definition is expressly limited to chapter 404-G, *see* RSA 404-G:2. Even if excess loss insurance is properly considered health insurance, it is not *direct* health insurance, which is the only kind of health insurance covered by the Life & Health Guaranty Act, *see* RSA 408-B:5, II(a), and the Act's liberal construction mandate does not give us the authority to ignore the legislature's use of the term "direct," *see Winnacunnett Coop. Sch. Dist. v. Town of Seabrook*, 148 N.H. 519, 525-26 (2002) ("When construing a statute, we must give effect to all words in a statute and presume that the legislature did not enact superfluous or redundant words.").

Because the Trust's Legion policy was not a form of insurance covered by the Life & Health Guaranty Act, we affirm the trial court's grant of summary judgment in favor of NHLHIGA.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.