Department of Environmental Services
No. 2004-601

APPEAL OF THE TOWN OF NOTTINGHAM

APPEAL OF THE TOWN OF BARRINGTON

APPEAL OF SAVE OUR GROUNDWATER

(New Hampshire Department of Environmental Services)

Argued: September 15, 2005
Opinion Issued: May 19, 2006

540

*Nelson, Kinder, Mosseau & Saturley, P.C.*, of Manchester (*E. Tupper Kinder* and *Richard C. Bell* on the brief, and *Mr. Kinder* orally), for petitioner Town of Nottingham.

*Pierce Atwood LLP*, of Portsmouth (*Mark E. Beliveau* on the brief and orally), for petitioner Town of Barrington.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief), for petitioner Save Our Groundwater.

*Soltani/Mosca P.L.L.C.*, of Epsom (*Edward C. Mosca* on the brief and orally), for the respondent, USA Springs, Inc.

*Steven B. Conklin*, by brief, *pro se.*

*Kelly A. Ayotte*, attorney general (*Jennifer J. Patterson*, senior assistant attorney general, on the brief), for the State, as *amicus curiae.*

*Jenkins Legal Services*, of Eaton Center (*Linda A. Jenkins* on the brief), for the New Hampshire Program of the American Friends Service Committee, as *amicus curiae.*

*Duddy Law Offices, P.L.L.C.*, of Bedford (*Roy A. Duddy* on the memorandum), for Public Citizen, as *amicus curiae.*

*Gordon R. Blakeney, Jr.*, of Concord, on the memorandum, and *Sack Goldblatt Mitchell*, of Ottawa, Ontario, Canada (*Steven Shrybman* on the memorandum), for Maude Barlow and the Blue Planet Project, as *amici curiae.*

DALIANIS, J. The petitioners, Town of Nottingham, Town of Barrington and Save Our Groundwater (SOG), appeal the issuance by the New Hampshire Department of Environmental Services (DES) of a large groundwater withdrawal permit to the respondent, USA Springs, Inc. We affirm.

The following facts were found by DES or appear on the record before us. On May 24, 2001, USA Springs applied to DES for a large groundwater withdrawal permit, *see* RSA 485-C:21 (2001) (amended 2005), proposing to withdraw up to 439,200 gallons of water per day from a spring and three bedrock wells for the purpose of bottling water. Following completion of hydrogeologic testing at the site, USA Springs submitted the results of its testing and analysis in a Final Report dated February 3, 2003.

DES denied the application on August 12, 2003, based upon failure to meet regulatory requirements with respect to both water quantity and water quality. At USA Springs' request, DES granted a rehearing, but again denied the application. The second denial was based only upon issues relating to water quality.

On December 29, 2003, MyKro Waters, Inc. (MyKro Waters), on behalf of USA Springs, sent DES a letter which stated that it was "being submitted as [a] Preliminary Application for a Large Groundwater Withdrawal Permit for a proposed bottling plant." The letter stated that in accordance with prior communications with DES, "the required information as specified in [New Hampshire Administrative Rules,] Env-Ws 388.10 is already on file with the Department in the February 3, 2003

[Final Report] ... and subsequent submissions pertaining to DES comments."

On March 10, 2004, MyKro Waters, on behalf of USA Springs, wrote to DES to "document completion" of its final application for a large groundwater permit. DES approved the application and issued a large groundwater withdrawal permit on July 1, 2004. The petitioners appeal.

At the time this appeal was filed, RSA 485-C:21, VI provided that appeals from a DES decision would be in accordance with RSA chapter 541. RSA 485-C:21, VI. Thus, our standard of review is provided by RSA 541:13 (1997):

> Upon the hearing the burden of proof shall be upon the party seeking to set aside any order or decision of [DES] to show that the same is clearly unreasonable or unlawful, and all findings of [DES] upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable.

This case involves the application of and interplay among various State statutes, as well as claims under administrative rules, the common law and the Federal and State Constitutions. RSA chapter 485-C, the Groundwater Protection Act, clearly applies to the large groundwater withdrawal permit at issue. In particular, RSA 485-C:4, XII (2001) directs the commissioner of DES to adopt rules in relation to, among other things, "[a]ll new groundwater withdrawals of 57,600 gallons or more in any 24-hour period." The petitioners claim a number of violations of RSA chapter 485-C and the administrative rules promulgated thereunder. In addition, Nottingham and SOG assert that the statement of policy in RSA chapter 481, entitled "State Dams, Reservoirs and Other Water Conservation Projects," requires DES to consider public trust issues in its evaluation of groundwater withdrawal permit applications. Nottingham and Barrington also contend that USA Springs' proposed project is subject to RSA chapter 482-A, entitled "Fill and Dredge in Wetlands." Nottingham raises an additional claim of error under the Administrative Procedure Act, RSA chapter 541-A, and both it and SOG assert the applicability of RSA chapter 21-O.

We will first clarify the law applicable to this case by addressing the petitioners' claims under RSA chapter 481 and RSA chapter 482-A. We will then address SOG's constitutional takings claim and the issues raised under RSA chapter 541-A and RSA chapter 21-O. Finally, we will turn to

the petitioners' claims under RSA chapter 485-C and the rules promulgated thereunder.

## I. RSA 481:1 and the Public Trust Doctrine

Nottingham and SOG raise a number of issues dealing with RSA 481:1 and the public trust doctrine. Nottingham argues that the policy expressed in RSA 481:1 applies to large groundwater withdrawals governed by RSA chapter 485-C, and that DES erred in "conclud[ing] that it has no obligation or authority to consider the public trust mandate to manage the groundwater resource to the maximum public benefit."

Section one of RSA chapter 481, State Dams, Reservoirs and Other Water Conservation Projects, sets forth the following declaration of policy:

> The general court finds that an adequate supply of water is indispensable to the health, welfare and safety of the people of the state and is essential to the balance of the natural environment of the state. Further, the water resources of the state are subject to an ever-increasing demand for new and competing uses. The general court declares and determines that the water of New Hampshire whether located above or below ground constitutes a limited and, therefore, precious and invaluable public resource which should be protected, conserved and managed in the interest of present and future generations. The state as trustee of this resource for the public benefit declares that it has the authority and responsibility to provide careful stewardship over all the waters lying within its boundaries. The maximum public benefit shall be sought, including the assurance of health and safety, the enhancement of ecological and aesthetic values, and the overall economic, recreational and social well-being of the people of the state. All levels of government within the state, all departments, agencies, boards and commissions, and all other entities, public or private, having authority over the use, disposition or diversion of water resources, or over the use of the land overlying, or adjacent to, the water resources of the state, shall comply with this policy and with the state's comprehensive plan and program for water resources management and protection.

RSA 481:1 (2001). Nottingham asserts that this statute directs DES, "in administering RSA 485-C, ... to consider 'the interest of present and future generations' and the 'maximum public benefit' in assessing any application to withdraw groundwater." SOG also appears to contend that RSA 481:1 imposes a public trust obligation upon DES.

USA Springs, on the other hand, argues that RSA 481:1 is "the statement of purpose [for] an entirely different Chapter" and is therefore inapplicable to RSA chapter 485-C. In addition, the State, as *amicus curiae*, contends that "[w]hile the language of RSA 481:1 sets ambitious general public policy goals for the state as a whole, it does not impose a duty on DES to engage in any particular analysis or make any specific finding prior to issuing an individual groundwater withdrawal permit." Rather, the State argues, the more specific provisions of RSA chapter 485-C control over RSA 481:1, the more general statute. *See State v. Rix*, 150 N.H. 131, 133 (2003) ("A specific law is deemed to control a specific case over a general law.").

We agree with USA Springs and the State that RSA chapter 485-C provides the criteria that DES must follow in issuing groundwater withdrawal permits and that RSA 481:1 imposes no specific additional test that DES must apply. RSA chapter 485-C, the Groundwater Protection Act, contains its own statement of purpose, which references the State's "general responsibility for groundwater management in the public trust and interest." RSA 485-C:1, II (2001). It does not incorporate RSA 481:1 by reference. As previously noted, RSA 485-C:4, XII directs DES to adopt rules relating to large groundwater withdrawals, and it specifically instructs that these rules shall include:

> (a) Criteria and procedures for requiring persons to identify and address impacts of withdrawals on surface waters, subsurface waters, water-related natural resources, and public, private, residential, and farm wells within the anticipated zone of contribution to the withdrawal.
>
> (b) Requirements relative to conservation management plans which demonstrate the need for the proposed withdrawals, to be submitted by the persons seeking approval for a withdrawal.
>
> (c) Procedures by which the department may deny permission for withdrawals or order the applicant to provide a response policy, as provided by department rules, for provision of alternative water supply at no initial capital cost to persons whose wells are adversely affected by the proposed withdrawal or order reduced withdrawals if hydrogeologic data indicate that water-related resources are being adversely affected by the withdrawals.

RSA 485-C:4, XII. We conclude that the scope of DES' consideration in reviewing a groundwater application is circumscribed by RSA chapter 485-C and valid rules promulgated thereunder. We therefore reject

Nottingham's contention that "[c]ompliance with the rules is the bare minimum which the applicant must prove and DES must demand."

SOG asserts that a public trust in groundwater is also established by common law. It first acknowledges that the common law concepts to which it refers have "generally been developed ... through tort law." It then argues that "[t]he standards which have evolved for private disputes can apply equally well here;" or "[s]aid differently, New Hampshire's reasonable use rule provides guidelines for application of the public trust doctrine."

We decline SOG's invitation to engraft common law tort principles onto the statutory and regulatory scheme governing groundwater withdrawals. SOG is not asking us to interpret the statutory and regulatory provisions; it is asking us to add to them. "It is not the function of this court to add provisions to the statute that the legislature did not see fit to include." *Appeal of Richards*, 134 N.H. 148, 162, *cert. denied*, 502 U.S. 899 (1991).

Nottingham also argues that "DES' decision will allow USA Springs to lower the water table over a broad area thus impacting both natural resources and the operations of private wells. . . . DES has not explained how this is consistent with its public trust obligations." In light of our holding that RSA chapter 485-C and the regulations promulgated thereunder provide the sole criteria that DES must follow in issuing groundwater withdrawal permits, and that no additional public trust test must be applied, we reject this argument.

## II. RSA chapter 482-A and Barrington Prime Wetland #40

Nottingham and Barrington argue that DES erred in not applying RSA chapter 482-A, entitled "Fill and Dredge in Wetlands," to USA Springs' proposed groundwater withdrawal. In particular, they contend that DES should have required USA Springs to apply for a dredge and fill permit under RSA 482-A:3, I (Supp. 2005) (amended 2003, eff. July 1, 2006) and should have held a prime wetlands hearing pursuant to RSA 482-A:11, IV (2001).

RSA 482-A:3, I, provides, in part, that "[n]o person shall excavate, remove, fill, dredge or construct any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state without a permit from the department." Nottingham and Barrington argue that the drawdown of water from Barrington Prime Wetland #40 constitutes a removal of that water for purposes of RSA 482-A:3, I. This interpretation, however, adds a word to the statute that is not there; namely, "water." "The starting point in any statutory interpretation case is the language of the statute. We will not consider what the legislature might have said or

add words that the legislature did not include." *In re Juvenile 2003-604-A*, 151 N.H. 719, 720 (2005) (citation omitted).

We find RSA 482-A:3, I, to be ambiguous in that the word "remove" has no obvious direct object. Two interpretations are possible. Under the first, the direct object is "structures": "No person shall . . . remove . . . any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state . . . ." Under the second interpretation, the direct object is the phrase "any bank, flat, marsh, or swamp": "No person shall . . . remove . . . any bank, flat, marsh, or swamp in and adjacent to any waters of the state without a permit from the department." This interpretation finds some support in the similar wording of RSA 482-A:21, I (2001), which provides: "No person shall excavate, remove, or dredge any bank, flat, marsh, swamp, or lake bed that lies below the natural mean high water level of any public waters of this state, except as provided in this subdivision."

We need not determine which interpretation is correct, as neither supports Nottingham and Barrington's position. This conclusion does not imply, however, as Barrington argues, "that *other* means of achieving the same destructive result [as filling or dredging wetlands] amount to unregulated (*i.e.*, permitted) activity;" it merely means that the activity is not regulated under RSA 482-A:3, I.

We note, for instance, that RSA 485-C:4, XII(a) directs DES to adopt rules that include "[c]riteria and procedures for requiring persons to identify and address impacts of withdrawals on surface waters, subsurface waters, water-related natural resources, and public, private, residential, and farm wells within the anticipated zone of contribution to the withdrawal." DES has adopted rules that define adverse impacts for a major withdrawal to include "[a] net loss of values for submerged lands under tidal and fresh waters and its wetlands as set forth in RSA 482-A," N.H. ADMIN. RULES, Env-Ws 388.18(c)(7), and that provide criteria for wetlands monitoring and reporting, *id.* 388.20(c).

█ Because we conclude that USA Springs' proposed groundwater withdrawal is not subject to the permitting requirements of RSA 482-A:3, I, we also reject Nottingham and Barrington's argument that DES erred in not holding a public hearing under RSA 482-A:11, IV.

*III. Taking*

SOG contends that granting a large groundwater withdrawal permit to USA Springs is an unconstitutional taking of property in violation of the State and Federal Constitutions. It argues:

> [T]he hydro-geological reality is that the mining of water by USA Springs, Inc. will (and during pump testing already did) decrease the level of water in homeowners' wells, require deepening of wells or new wells to maintain water availability, decrease well pressure, cause early wear on homeowner's pumping equipment, and result in contamination of water in their wells.

SOG then asserts that USA Springs' permit must be revoked because "there has been no finding of a public purpose [for the taking], and no compensation."

USA Springs first contends that SOG lacks standing to bring a takings claim and that it has not preserved the issue because it failed to properly raise it in its motion for rehearing. We will assume without deciding, however, that SOG has standing and has preserved the issue, and we will address the merits of the claim.

USA Springs also challenges SOG's claim for failure to show a property interest in what is allegedly being taken. "In the absence of a property right, no taking for purposes of part I, article 12 of the State Constitution has occurred . . . ." *Adams v. Bradshaw*, 135 N.H. 7, 14 (1991), *cert. denied*, 503 U.S. 960 (1992)); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984) (first inquiring, in a federal taking claim, whether Monsanto had a property interest protected under the United States Constitution's Fifth Amendment). SOG asserts that "[p]ollution or diminution of one's drinking water is an unconstitutional taking . . . because landowners have a property right in subterranean water flows." (Citations omitted.) The case SOG cites for its assertion of a property right, however, actually rejects the view that "each land-owner has the entire and unqualified ownership of all water found in his soil, not gathered into natural water-courses." *Bassett v. Company*, 43 N.H. 569, 577 (1862). Rather, *Bassett* adopted the doctrine of reasonable use: "The maxim, '*Sic utere*,' &c., therefore applies, and, as in many other cases, restricts each [land-owner] to a reasonable exercise of his own right, a reasonable use of his own property, in view of the similar rights of others." *Id.* Therefore, instead of absolute ownership of the groundwater beneath one's land, "the right of each is only to a reasonable user or management." *Id.*

We find this distinction fatal to SOG's takings claim. As stated by the Florida Supreme Court:

> The right to use water does not carry with it ownership of the water lying under the land. . . . This "right of user" may be protected by injunction, or regulated by law, but the right of user is not considered "private property" requiring condemnation

proceedings unless the property has been rendered useless for certain purposes.

*Village of Tequesta v. Jupiter Inlet Corp.*, 371 So. 2d 663, 668 (Fla.) (citations omitted), *cert. denied*, 444 U.S. 965 (1979). Similarly, the court in *Smith v. Summit County*, 721 N.E.2d 482, 488 (Ohio Ct. App. 1998), held: "The loss of the use of ground water is not a loss of the use or enjoyment of the overlying land. In this case, plaintiffs' complaint, alleging only a deprivation of the flow of groundwater, did not state a claim for compensation."

■ SOG has cited case law from other jurisdictions in support of its takings argument. We note, however, that while property interests are protected under the Federal, as well as the State, Constitutions, they "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus*, 467 U.S. at 1001 (quotations omitted). Thus, we do not find persuasive cases from jurisdictions in which the law of water rights differs materially from our own, *see, e.g., Hansen v. United States*, 65 Fed. Cl. 76, 123 (Fed. Cl. 2005), and conclude that SOG has not shown a protected property interest under New Hampshire law.

*IV. Adjudicative Hearing*

Nottingham and SOG argue that DES erred in failing to hold an adjudicative hearing, which they requested in July 2004. Nottingham argues that such a hearing was required under RSA 541-A:31 and DES' own rules. Specifically, Nottingham argues that DES should have held an adjudicative hearing because "consideration of the application had become a contested case." RSA 541-A:31, I (1997) provides in relevant part that "[a]n agency shall commence an adjudicative proceeding if a matter has reached a stage at which it is considered a contested case." "Contested case," in turn, is defined as "a proceeding in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after notice and an opportunity for a hearing." RSA 541-A:1, IV (1997).

Nottingham's argument appears to be based upon the assertion that it was a party to the USA Springs proceeding. It states that it "contested the applicant's proposal relative to the rights of the municipality and participated in the permit proceeding as a party." "Party" is statutorily defined as "each person or agency named or admitted as a party, or properly seeking and entitled as a right to be admitted as a party." RSA 541-A:1, XII (1997). Nottingham has failed, however, to point us to any evidence that it was admitted to the proceeding as a party. *See* SUP. CT. R.

13(2) ("The moving party shall be responsible for ensuring that all or such portions of the record relevant and necessary for the court to decide the questions of law presented by the case are in fact provided to the supreme court."); SUP. CT. R. 16(3)(d) (moving party's brief shall contain statement of facts material to consideration of questions presented "with appropriate references to the appendix or to the record").

Our review of the record reveals that in May 2003, Nottingham moved to intervene in the USA Springs proceeding. DES' decision on this motion, however, does not appear to be included in the portion of the record provided to us. *Cf. Cook v. CIGNA Ins. Co.*, 139 N.H. 486, 488 (1995) (refusing to consider, in support of contention that plaintiff was not a real party in interest, a purported motion to substitute or add a party, where neither the motion nor the trial court's action thereon were contained in the record before this court). We also note that in its motion for adjudicative hearing, filed on July 20, 2004, Nottingham did not refer to itself as a party or an intervenor, but rather argued that certain "language [in RSA 485-C:21] provides affected municipalities with a status *equivalent to that of a party* entitled to notice and opportunity to be heard." (Emphasis added.)

Nottingham makes a similar argument on appeal, contending that the definition of contested case is met because it was entitled to notice and an opportunity to be heard under RSA 485-C:21. RSA 485-C:21, II (2001) provides, in part, that copies of an application for approval of a groundwater withdrawal of 57,600 gallons or more "shall be forwarded by certified mail by the applicant to the governing bodies of each municipality and each supplier of water within the anticipated zone of contribution to the well." The statute also provides for the holding of a public hearing on the application upon the timely request of the governing body of any municipality within the anticipated zone of contribution, and for the submission by such municipality to DES of comments regarding the proposed withdrawal. RSA 485-C:21, III, V (2001).

We have noted, however, that the ability to call a public hearing on an issue before an administrative agency does not make one a party to the proceeding. *See Appeal of Toczko*, 136 N.H. 480, 486 (1992). Nor, we now hold, does the entitlement to notice of the proceedings and the opportunity to submit comments to the agency make one a party. Because Nottingham has failed to refer us to evidence in the record of its purported party status, we reject its argument that it is entitled to an adjudicative hearing based upon its contention that this is a contested case.

For similar reasons, we reject Nottingham's argument that it is entitled to a hearing under Rule 388.23(f), which provides that DES "shall

provide the applicant with an opportunity for a hearing in accordance with RSA 541-A:31 if the permit is denied." N.H. ADMIN. RULES, Env-Ws 388.23(f). Nottingham argues that "[a]lthough the regulation is silent as to the right of the municipality to an adjudicative hearing if the permit is granted, the regulation would violate principles of due process and equal protection unless it is interpreted to also allow access to an adjudicative proceeding to a municipality *which was a party* to the permit proceeding and is aggrieved by the grant of a permit." (Emphasis added.) As we have previously noted that Nottingham has failed to demonstrate that it was a party to the USA Springs proceeding, we need not address this argument further.

SOG contends that its federal and State constitutional rights require an adjudicative hearing. Specifically, it asserts the right to an adjudicative hearing based upon due process, the right of cross-examination and the presence of significant social issues. It first argues, quoting *Society for the Protection of New Hampshire Forests v. Site Evaluation Committee*, 115 N.H. 163, 168 (1975), that "[w]here issues of fact are presented for resolution by an administrative agency due process requires a meaningful opportunity to be heard." That case held, however, that the statute in question, "[i]n requiring 'public hearings' on applications for site and facility, ... provided an opportunity to be heard." *Id.* We similarly conclude that an opportunity to be heard was provided by the public hearings on USA Springs' permit application.

SOG also argues that because "a constitutional takings issue" is presented in this case, due process requires a hearing on public use, loss to landowners and compensation. Having rejected SOG's takings claim, we need not address this argument.

SOG next claims an entitlement to a hearing based upon an alleged right of cross-examination. Read broadly, SOG's brief appears to cite due process under the State Constitution as a basis for this alleged right. To determine whether "due process requires meaningful cross-examination," we would examine the following three factors:

(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*In re Eduardo L.*, 136 N.H. 678, 686 (1993) (quotations omitted); *see Petition of Bagley*, 128 N.H. 275, 285 (1986).

SOG neither cites nor discusses the foregoing three-factor analysis, and makes no developed argument as to why it has a right to cross-examination in this proceeding. Accordingly, we conclude that this issue was not adequately briefed and, therefore, decline to address it. *See Appeal of AlphaDirections*, 152 N.H. 477, 483-84 (2005).

Finally, SOG contends that "[w]ith the prodding of this court [another agency] stopped behaving as a mere permitting agency and recognized that it was a forum in which substantial public rights are decided." It then urges us to similarly "prod" DES. We find no support for SOG's premise in the cases it cites, and we note that it is not this court's function to "prod" administrative agencies to engage in activities not authorized by their governing statute. If any action is to be taken regarding SOG's underlying contention that a formal hearing *should* be required "for the DES to adjudicate the removal of millions of gallons of the public's groundwater," it is for the legislature to determine.

*V. Appeal under RSA chapter 21-O*

Nottingham and SOG argue that they should have been afforded intermediate appellate review before the water council pursuant to RSA 21-O:7, IV (2000) (amended 2003, 2004), which provides, in part, that "[t]he water council shall hear and decide all appeals from [DES] decisions relative to the functions and responsibilities of the division of water other than [DES] decisions made under RSA 482-A relative to wetlands, in accordance with RSA 21-O:14." USA Springs contends that RSA 21-O:7 conflicts with RSA 485-C:21, VI, which directs that "[r]ehearings and appeals from a decision of [DES] under this section shall be in accordance with RSA 541." It then argues that RSA 485-C:21, VI, as the more specific statute, should control. *See Rix*, 150 N.H. at 133. Nottingham and SOG, on the other hand, attempt to reconcile the statutes, arguing that because RSA chapter 541 is "procedural, it does not by its terms, exclude any step in the appeal process, such as an intermediate review by the Water Council."

We agree with USA Springs that the two statutes conflict: in providing an explicit procedure for appeals, RSA 485-C:21, VI excludes any other, and, as the more specific statute, it controls over RSA 21-O:7. We note that the legislature amended RSA 485-C:21, VI in 2005 to provide that "[d]ecisions of [DES] may be appealed in accordance with RSA 21-O:7, IV," RSA 485-C:21, VI (Supp. 2005), an action that would have been unnecessary under Nottingham and SOG's interpretation of the statutes.

## VI. RSA chapter 485-C and DES Rules

### A. Need

The petitioners argue that USA Springs failed to make the showing of need, as required by statute and DES' rules, for its proposed withdrawal. RSA 485-C:4, XII directs DES to adopt rules relating to "new groundwater withdrawals of 57,600 gallons or more in any 24-hour period," including "[r]equirements relative to conservation management plans which demonstrate the need for the proposed withdrawals," RSA 485-C:4, XII(b) (2001). Rule 388.05, in turn, provides in part, that "[t]he applicant shall prepare a water conservation management plan and description of need to demonstrate the efficient use of, and need for, the proposed withdrawal in the permit application . . . ." N.H. ADMIN. RULES, Env-Ws 388.05(a).

DES stated, in its denial of motions for rehearing filed by the petitioners and others, that "[n]eed in the context of a large groundwater withdrawal permit is a term of art used to describe efficiency or conservation." Nottingham, on the other hand, argues that "[t]aken in context, the clear intent of both the statutory language and DES' regulations is that 'need' and 'efficient use' are two different concepts, both of which must be satisfied by an applicant."

Even if we were to accept Nottingham's contention that "need" means something different from "efficient use," however, we would still have to determine what "need" means. Nottingham argues that "DES' interpretation that allows it to simply approve any amount requested by an applicant is patently unreasonable." We disagree, at least in part.

█ The legislature has failed to define "need" in RSA chapter 485-C. "When statutory terms are undefined, we ascribe to them their plain and ordinary meaning." *Kenison v. Dubois*, 152 N.H. 448, 451 (2005). The most relevant definition of "need" in Webster's dictionary is "a want of something requisite, desirable, or useful." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1512 (unabridged ed. 2002). Thus, RSA 485-C:4, XII(b) and Rule 388.05 require DES to determine whether the proposed withdrawal is "requisite, desirable, or useful." *Id.*

The description of need in USA Springs' February 3, 2003 Final Report cites both "data [that] clearly indicate that there is a strong existing public demand for bottled drinking water in the United States" and "research [that] indicates that the growth rate for consumer demand for bottled water sales will be nearly 12% annually in the years ahead." It also states that the "proposed project will produce for consumers in the general public, healthy drinking water for which there is increasing consumer

demand." The Report then proposes the withdrawal of a specified amount of groundwater "[t]o meet the[se] needs and demands." We conclude that DES could reasonably have found that this proposed withdrawal was "desirable[] or useful," *id.*, and therefore could reasonably have concluded that USA Springs' description of need complied with RSA 485-C:4, XII(b) and Rule 388.05.

We note that we are not persuaded by any of the definitions of need proffered by the petitioners. For instance, in arguing that DES failed to conduct an analysis of need, Nottingham asserts: "For example, it did not require a demonstration by the applicant that the extraction level was *required* by its business plan." We can find no statutory or regulatory basis for such a requirement. Similarly, Barrington argues that "in order to demonstrate 'need' for withdrawals in excess of 57,600 gallons per day one must first establish that its proposed withdrawal is both reasonable in terms of the ability of the environment to tolerate and sustain the withdrawal and, that the proposed use of the extracted groundwater is not contrary to the public interest, as declared in RSA 481:1." Again, we can find no statutory or regulatory basis to import concepts of sustainability and public interest into the term need, particularly where sustainability is dealt with in other parts of the statutory and regulatory scheme, *see, e.g.*, RSA 485-C:4, XII(a); N.H. ADMIN. RULES, Env-Ws 388.18, and we have already determined that RSA 481:1 imposes no specific additional test for groundwater withdrawal applications.

Finally, Barrington and SOG cite *Amoskeag Trust Co. v. Wentworth*, 99 N.H. 346, 348 (1955) (citation omitted), for the following definition: "[T]he words 'necessities and needs' . . . are rather relative terms having no fixed or rigid meaning. However, they do not cover that which is merely desirable and not reasonably essential." Not only is this a definition of a compound term different from the statutory term before us, but we also agree with USA Springs that our interpretation should be guided by the statutory context in which the term appears. In particular, "[o]ur goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *State v. Whittey*, 149 N.H. 463, 467 (2003) (quotation omitted). We therefore decline to import into an interpretation of the Groundwater Protection Act a purported definition of need arising in the interpretation of a will, which itself was guided by "[w]hat the testatrix intended." *Amoskeag Trust Co.*, 99 N.H. at 347.

### B. DES' Failure to Follow its Own Rules

Nottingham and Barrington argue that DES also failed to follow its own rules in assessing USA Springs' application. "The law of this State is well

settled that an administrative agency must follow its own rules and regulations." *Attitash Mt. Service Co. v. Schuck*, 135 N.H. 427, 429 (1992). An agency "must also comply with the governing statute, in both letter and spirit," *Appeal of Morin*, 140 N.H. 515, 519 (1995), and "agency regulations which contradict the terms of a governing statute exceed the agency's authority." *Appeal of Gallant*, 125 N.H. 832, 834 (1984).

When interpreting agency rules, "where possible, we ascribe the plain and ordinary meanings to words used." *Appeal of Flynn*, 145 N.H. 422, 423 (2000) (quotation omitted). We also look at the rule we are construing as a whole rather than in segments. *Appeal of Alley*, 137 N.H. 40, 42 (1993). Finally, while we accord deference to an agency's interpretation of its own regulations, "that deference is not total. We still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve." *Id.* (quotation omitted).

We note that neither Nottingham nor Barrington appears to challenge the validity of DES' regulations themselves. Nottingham makes a passing comment in its brief that "DES should have developed a stringent set of permitting standards or regulations for an applicant to meet." Even if we took this to be an argument, however, we would consider it waived due to Nottingham's failure to adequately brief it. *See State v. Hermsdorf*, 135 N.H. 360, 365 (1992). Thus, as we read Nottingham's and Barrington's briefs, they argue that DES erred in interpreting its rules. We address each claim of error in turn.

### 1. Conceptual hydrologic model

Nottingham argues that DES erred in accepting a conceptual hydrologic model from USA Springs that "contained direct contradictions." Specifically, the model posited "simultaneously that the bedrock and overburden aquifers were isolated from each other and that they were closely connected."

In its decisions and findings related to the issuance of the permit, DES acknowledged that the hydrologic model in USA Springs' first application "presented two conflicting conceptual models" and that USA Springs had used this hydrologic model "as the basis for concluding that very limited environmental monitoring, reporting and mitigation would be required to address impacts to water users and water resources." DES then noted:

> USA Springs never fully reconciled the contradictions in the conceptual [hydrologic] model put forth in its February 2003 Final Report. However, it did substantially revise its application in submittals it made in August 12, 2003 and September 11, 2003

in response to the Department's comments and acknowledged that contradictions exist in how data from the withdrawal test can be interpreted. USA Springs also proposed an environmental monitoring, reporting, and mitigation program to address uncertainties associated with its withdrawal test and potential impacts based upon a conservative "worst case" interpretation of data contained in its application. This approach ensures that no unmitigated adverse impacts occur as required by Env-Ws 388.

DES regulations provide that one of the requirements for obtaining a major withdrawal permit is that the applicant "[d]evelop a conceptual hydrologic model of the withdrawal in accordance with Env-Ws 388.06." N.H. ADMIN. RULES, Env-Ws 388.04 (c)(2). Rule 388.06 itself contemplates that gaps in the available data may exist and that the model may later need to be refined:

(f) Where data gaps are identified during the development of the conceptual hydrologic model, the model shall:
(1) Identify the data gaps and their significance to understanding the impacts of the proposed withdrawal; and
(2) Estimate the reasonably suspected hydrologic scenario(s) associated with the withdrawal that could occur given the known and unknown model parameters.
(g) The conceptual hydrologic model shall identify data needed to refine the model to complete the report required in Env-Ws 388:17.

*Id.* 388.06. In addition, Rule 388.08(f) provides that "[t]he applicant shall describe limitations to the estimate of the withdrawal effects identified in Env-Ws 388.06(f) as a result of the data gaps or complexity of the geology." *Id.* 388.06(f).

Data gaps are also contemplated in the rules for withdrawal testing and for impact monitoring, reporting and/or mitigation. Pursuant to Rule 388.09(c), a withdrawal testing program "shall be designed to address critical data gaps, limitations, or insufficiencies identified in Env-Ws 388.06 and Env-Ws 388.08 that are necessary to complete impact assessments required by these rules." *Id.* 388.09(c). Rule 388.20 provides in part:

(a) A permittee shall conduct impact monitoring and reporting program when:
(1) Available information, including work completed in accordance with these rules, is not sufficient to verify

that adverse impacts from the large withdrawal will not occur, provided the available information does not suggest that an impact is:

 a. Irreversible; or

 b. Will occur immediately; and

(2) It is necessary to ensure that impact mitigation identified in Env-Ws 388.21 is effective in preventing adverse impacts from the withdrawal.

*Id.* 388.20. In addition, the regulations contemplate situations in which an "impact monitoring and reporting program [is made] a condition of the withdrawal permit," *id.* 388.20(i), and "[a] withdrawal permit requires mitigation from the start of operation to prevent adverse impacts anticipated during the permit application process," *id.* 388.21(a)(1).

 Looking at the applicable regulatory scheme as a whole, *cf. Appeal of Alley*, 137 N.H. at 42, we conclude that it anticipates situations in which the available data will be insufficient to develop a completely accurate conceptual hydrologic model. The rules then provide mechanisms for dealing with these situations, including impact monitoring, reporting and/or mitigation programs. Accordingly, in light of USA Springs' proposed implementation of impact monitoring, reporting and mitigation programs, we cannot say that DES' acceptance of USA Springs' ambiguous conceptual hydrologic model constituted either a failure to follow its own rules or an erroneous interpretation of those rules.

### 2. Poor testing conditions

 Nottingham argues that DES erred in accepting a report based upon "testing under very poor conditions, which adversely impacted the quality of the data[,] [i]nstead of requiring another test or supplemental data . . . ." DES' findings indicate, however, that USA Springs did submit supplemental analysis:

In February 2003, USA Springs provided a conceptual model that it claimed reflected conditions of 180 days of no net recharge from precipitation to groundwater as required by Env-Ws 388.06(h), Env-Ws 388.14, and Env-Ws 388.16, but the analysis did not actually adjust field data to this no recharge condition. The analyses initially completed by USA Springs used data collected during the withdrawal test that included the effects of precipitation before and during the test. The Department described this deficiency to USA Springs in a letter dated April 11, 2003 . . . and in its Final Decision dated August 12, 2003. USA

Springs then revised its analyses and submitted an addendum to its application on August 12, 2003, several hours after the Department issued its decision. The addendum provided by USA Springs corrected the analyses for the effects of precipitation and met the 180 day no net recharge condition required by Env-Ws 388.06(h), Env-Ws 388.14, and Env-Ws 388.16.

 Pursuant to Rule 388.09(a), "[a] withdrawal testing program shall be designed to *estimate* the effect of the withdrawal *under conceptual hydrologic model withdrawal conditions*, that is, 180-days of continuous operation at maximum rates without recharge from rainfall or snowmelt." N.H. ADMIN. RULES, Env-Ws 388.09(a) (emphases added). We conclude that the regulations do not require testing under ideal conditions, but testing designed to estimate effects under specified conditions. We cannot say that DES' acceptance of data obtained under poor testing conditions, but adjusted to meet the specified conditions, constituted either a failure to follow its own rules or an erroneous interpretation of those rules.

### 3. Stabilization of wells during testing

Nottingham argues that although DES stated prior to USA Springs' testing that "[i]f the test is designed properly, water levels should come into a state of dynamic equilibrium that promotes a conclusion that the proposed rate of withdrawal is sustainable," it accepted a pumping test during which the wells did not stabilize prior to termination of the test. Nottingham further asserts: "DES concedes that the proposal will partially dewater both bedrock and overburden aquifers but does not know the extent. Instead of requiring the applicant to satisfy its burden of proof, DES again carved out an exception which allowed a deficient application to be approved by substituting conditions for monitoring instead of requiring accurate data."

In its December 11, 2003 findings and decision on motion for rehearing, DES stated: "The withdrawal test for USA Springs demonstrated that the proposed withdrawal will partially dewater bedrock and overburden aquifers necessitating the development of an acceptable monitoring, reporting and mitigation plan." DES found that the monitoring and reporting program put forward by USA Springs "could proactively prevent adverse water quantity or water level impacts from occurring." It then found that the final proposal by USA Springs "adequately address[ed] the probable impacts of the proposed large withdrawal" except for impacts associated with contaminated groundwater, an issue later addressed in a condition in the approved permit.

DES' rules anticipate that adverse impacts due to the proposed withdrawal may occur and, moreover, that there may be uncertainty as to whether such impacts will occur. For instance, Rule 388.20(a) contemplates that the available information may not be "sufficient to verify that adverse impacts from the large withdrawal will not occur," N.H. ADMIN. RULES, Env-Ws 388.20(a), and Rule 388.16 refers to adverse impacts that "might occur," *id.* 388.16(e)(3), and that "potentially might occur," *id.* 388.16(e)(2).

Nevertheless, the rules do not mandate denial of the application, but rather require the implementation of measures such as monitoring, reporting and mitigation. *Id.* 388.20, 388.21. In fact, Rule 388.23(b) directs that DES *"shall issue* or renew a major withdrawal permit described pursuant to Env-Ws 388.23," *id.* 388.23(b) (emphasis added), when, among other things, the information in the report produced in accordance with Env-Ws 388.17 demonstrates that the withdrawal will:

> b. Result in impacts that can and will be mitigated, provided:
> 1. There is sufficient information to verify that any adverse impacts that occur as a result of the withdrawal will not be:
> (i) An adverse impact that may occur immediately; and
> (ii) An irreversible impact; and
> 2. A monitoring and reporting program is implemented in accordance with Env-Ws 388.20.

*Id.* 388.23(b)(2), b. Furthermore, the governing statute expressly authorizes DES to adopt procedures by which it "may deny permission for withdrawals or order the applicant to provide a response policy." RSA 485-C:4, XII(c). Accordingly, we cannot say that DES' approval of a permit imposing monitoring, reporting and mitigation conditions constituted either a failure to follow its own rules or an erroneous interpretation of those rules.

### 4. Adoption of a "wait and see" approach

Nottingham contends that "DES substituted the requirement of a showing [of] protection of the public trust with a 'wait and see' approach which exposes the public resource to risk." Specifically, Nottingham argues that "DES has accepted the illusory protection of the Impact Monitoring and Reporting Program referenced in Env-Ws 388.20," and that even if the regulations could be interpreted to allow DES' "wait and see" approach, "such an interpretation would be unreasonable."

■ As indicated above, however, DES' rules expressly contemplate a conditional approach. For instance, Rule 388.04(c)(14) provides that "[w]hen observations under operating conditions are necessary to validate test results and verify that adverse impacts will not occur, the applicant shall develop and obtain approval of an impact monitoring and reporting program in accordance with Env-Ws 388.20." *Id.* 388.04(c)(14). Nottingham has not seriously contended that the rules themselves are invalid and we cannot say that DES' interpretation of its rules in accordance with the "plain and ordinary meanings [of the] words used," *Appeal of Flynn*, 145 N.H. at 423 (quotation omitted), is erroneous.

*5. Imposition of a condition less stringent than regulatory standard*

Nottingham argues:

> In its regulations, DES uses a conservative standard of modeling water levels assuming 180 days of pumping without recharge. Nevertheless, DES adopted a permit condition which requires implementation of the [Stage I management procedure], (calling for a reduction to 75% of permitted capacity), *only* when the groundwater is drawn down to a level *15 feet below* the groundwater levels projected for 180 day[s] with no recharge. The permit condition is unreasonable because it is less stringent than the standard.

DES found, however, that "USA Springs' plan and permit conditions require ... [it to] provide mitigation on a schedule *more stringent* than that required by the rule (Env-Ws 388.21)." (Emphasis added.) The source of the disagreement appears to be in Nottingham's characterization of the 180-day no-recharge projection. As USA Springs points out, that is not a "standard" in the sense urged by Nottingham; rather, it is an assumed state or condition: (1) upon which the conceptual hydrologic model is based, *see* N.H. ADMIN. RULES, Env-Ws 388.06(h); (2) under which the withdrawal testing program is designed to estimate effects, *see id.* 388.09(a); and (3) by the use of which, impacts are defined, *see id.* 388.16(c). DES' view, as stated in its July 1, 2004 decisions and findings, is that "State law and the large groundwater withdrawal permitting requirements (Env-Ws 388.18) protect private wells based upon minimum yield requirements (up to 10 gallon[s] per minute for private residential wells) *and not a threshold for drawdown* in a private well." (Emphasis added.) The "plain and ordinary meanings [of the] words used," *Appeal of Flynn*, 145 N.H. at 423 (quotation omitted), in Rule 388.18 support DES' position, as private wells are protected according to withdrawal capacity measured in gallons per minute. *See* N.H. ADMIN. RULES, Env-Ws 388.18(c)(1); *see*

*also id.* 388.18(d) ("A private residential well with a capacity greater than 10 gallons per minute for 4 hours after the withdrawal will not be considered adversely impacted."). As we do not agree that the 180-day no-recharge projection is a standard in the sense asserted by Nottingham, we reject its argument that the Stage I management procedure is less stringent than that standard.

*6. Extraction at greater than the natural recharge rate*

Nottingham argues that the permit condition prohibiting groundwater extraction at a rate greater than the natural recharge rate "is unreasonable because DES did not require the applicant to prove what the recharge rate is." In its July 1, 2004 decisions and findings, DES acknowledged that "[n]o attempt was made [by USA Springs] to determine how quick[ly] and how much water from each separate precipitation event recharges the bedrock aquifer." It found, however, that "[d]etermining this value for a bedrock aquifer is" not only impractical and "inconsistent with industry practices," but also "[n]ot specifically necessary for the Department to issue a permit in accordance with Env-Ws 388." It elaborated as follows:

> The Department is not aware of any instance in New England where the analysis of the exact timing of recharge associated with separate precipitation events is a regulatory requirement when a water supply is developed. In fact it is standard industry practice to derive estimates of recharge rates for almost any aquifer from: 1) Published research relevant to a particular geologic setting; and/or 2) Monitoring data collected during the long-term operation of the withdrawal. The Department finds USA Springs estimate of recharge to the bedrock aquifer to be of the same magnitude as recharge rates generally estimated based on standard industry practice for similar environments.

We cannot say that DES' failure to require USA Springs to prove the actual recharge rate constituted either a failure to follow its own rules or an erroneous interpretation of those rules. We see nothing in DES' rules requiring a calculation of actual recharge rates. Rather, descriptions of certain recharge-related occurrences are required as part of the conceptual hydrologic model. For instance, Rule 388.06(l) requires preparation of "[a] description of the hydrologic cycle and a water budget calculation for the study area" describing:

> (1) The amounts and timing of precipitation, runoff, storage, recharge, and discharge;

(2) The distribution and availability of water necessary to maintain natural resources, existing water uses, and the proposed withdrawal; and

(3) The location and amounts of natural and artificial loss of water, consumption, discharge, and recharge of water to and from the study area.

N.H. ADMIN. RULES, Env-Ws 388.06(l). Rule 388.06(m) requires preparation of "[a] comprehensive description of the groundwater flow regime that describes hydraulic boundaries, recharge patterns, and the interaction of water bodies associated with the withdrawal." *Id.* 388.06(m)

 Rule 388.06(c), however, provides:

The conceptual hydrologic model shall be based on information including but not limited to:

(1) A summary of the results from any hydrogeologic investigations conducted on site to date;

(2) Historic water level data;

(3) *Department records* for existing water users and resources including testing and production reports;

(4) *Published reports*;

(5) *National resource conservation service maps*; and

(6) *United States geological survey geologic*, bedrock lineament, and stratified-drift aquifer *maps*.

*Id.* 388.06(c) (emphases added). Accordingly, we conclude that DES' acceptance of USA Springs' recharge estimate based upon a United States Geological Survey source is not contrary to a reasonable interpretation of DES' regulations.

*7. Complete and Correct Data/Conditional Permit*

Barrington argues that by issuing a large groundwater withdrawal permit to USA Springs, DES violated Rule 388 by: (1) failing to require USA Springs "to submit 'complete and correct' information about its withdrawal"; and (2) attempting to circumvent the requirement of complete and correct information "by imposing a set of 'conditions subsequent' to the grant of the application." Rule 388.23 (b) provides, in part, that DES "shall issue or renew a major withdrawal permit described pursuant to Env-Ws 388.23 ... [w]hen the information in the report

produced in accordance with Env-Ws 388.17 is complete and correct." N.H. ADMIN. RULES, Env-Ws 388.23 (b)(1). In its August 12, 2003 findings and decisions related to the denial of USA Springs' first application, DES stated that it could not approve the application because it "does not contain all of the information required by Env-Ws 388.17 and consequently is not complete and correct." In its July 1, 2004 decisions and findings approving the permit, however, DES noted that "USA Springs subsequently complied with the requirements of Env-Ws 388 by submitting supplemental information after [DES'] August 12, 2003 decision. USA Springs then supplemented its original information by [submissions] on August 12, 2003 and then again on September 11, 2003 as part of its request for rehearing."

Barrington nevertheless argues that DES issued the permit "while finding that information submitted by USA Springs was *still* not complete or correct." Specifically, Barrington notes that in DES' December 11, 2003 decisions and findings on USA Springs' motion for rehearing (*i.e.*, after the supplemental submissions cited by DES in its July 1, 2004 decisions and findings), it found that "USA Springs has not amended its application to correct the contradictions" in its conceptual hydrologic model.

Taken out of context, that specific December 11, 2003 finding appears to support Barrington's argument and undercut DES' later position that USA Springs had adequately amended its application. Later in the same section of those findings and decisions, however, DES stated that "[t]he withdrawal test for USA Springs demonstrated that the proposed withdrawal will partially dewater bedrock and overburden aquifers *necessitating the development of an acceptable monitoring, reporting and mitigation plan*." (Emphasis added.) DES then noted:

> In submittals dated September 11, 2003, USA Springs proposed a monitoring and reporting program that could proactively prevent adverse water quantity or water level impacts from occurring. The Department finds USA Springs' final proposal to adequately address the probable impacts of the proposed large withdrawal (except for impacts associated with the alteration of the flow of contaminated groundwater).

Thus, the December 11, 2003 "failure to amend" finding is not inconsistent with DES' July 1, 2004 position that while USA Springs "never reconciled contradictions in its conceptual [hydrologic] model[,] . . . [t]o account for this, USA Springs then proposed an environmental monitoring, reporting, and mitigation program to address all impacts that could occur."

██ We concluded above that the regulatory scheme contemplates cases in which a completely accurate conceptual hydrologic model cannot be developed due to insufficiencies in the available data. We also concluded that the rules contemplate using impact monitoring, reporting and/or mitigation programs to deal with such situations. Accordingly, we reject Barrington's argument that DES failed to require USA Springs "to submit 'complete and correct' information about its withdrawal," and find no error in DES' determination that USA Springs' final application was "adequate because it correctly assesses withdrawal testing data by stating accurately that there is uncertainty, and by comprehensively addressing this uncertainty in accordance with the requirements of [the applicable regulations]." For similar reasons, we reject Barrington's argument that a monitoring and reporting program cannot substitute for complete and correct information.

### 8. Resubmission of Same Application

Barrington argues that DES either violated its own rules by accepting "informal and incomplete letters" as an application, or violated New Hampshire law by approving a resubmitted, previously-denied application absent a change in circumstances. Barrington notes that USA Springs' initial application was denied on August 12, 2003, and again, on rehearing, on December 11, 2003. On December 29, 2003, MyKro Waters submitted a letter that purported to be a preliminary application and relied upon information already on file with DES. By letter dated February 24, 2004, MyKro Waters submitted a supplement to its preliminary application, and stated that a "[f]inal permit application will be submitted after completion of the tasks described in this letter, per Env-Ws 388." Finally, on March 10, 2004, MyKro Waters wrote to DES to "document completion" of USA Springs' final application.

Barrington argues that to the extent DES treated these letters as a new application, it acted contrary to Rule 388.10, which requires an applicant to submit a "major withdrawal permit application" and specifies what that application must include.

██ Barrington's argument assumes that an applicant cannot incorporate previously-submitted information into a new application. As USA Springs points out, however, Rule 388.10 does not expressly preclude such a practice and DES, by its actions, implicitly interpreted the regulation to allow it. DES' interpretation of its own regulation is entitled to "great deference," although "[w]e still must examine the agency's interpretation to determine if it is consistent with the language of the

regulation and with the purpose which the regulation is intended to serve." *Petition of Pelletier*, 125 N.H. 565, 569 (1984) (quotation omitted).

Rule 388.10, as noted above, is silent on this issue, and we see nothing in the stated purpose of the regulations that would conflict with allowing incorporation of previously-submitted information. Indeed, such a practice merely promotes efficiency and obviates the need for duplication and resubmission of potentially voluminous records. Accordingly, we find no error.

Barrington further argues, however, that to the extent DES considered "MyKro Waters' letters to be a resubmission of the already denied application, based on no change in events," its approval of the application was contrary to *Fisher v. City of Dover*, 120 N.H. 187 (1980). USA Springs first argues that Barrington's *Fisher* argument was not preserved because it was not properly raised below. Although Barrington did not specifically cite *Fisher* in its motion for rehearing, it did argue the general principle that for a board or agency to "consider a second proposal for the same project that has been previously denied, . . . [t]he second proposal must be materially different." We therefore consider the argument preserved.

*Fisher* was a zoning case challenging the granting of a second application for a variance that the applicant "conceded was substantially the same as the variance previously requested and ultimately denied by the [zoning] board." *Id.* at 188. We held:

> [T]he board committed an error of law when it approved defendant's second application for a variance without first finding either that a material change of circumstances affecting the merits of the application had occurred or that the second application was for a use that materially differed in nature and degree from the use previously applied for and denied by the board.

*Id.* at 191.

USA Springs questions whether *Fisher*—a zoning case—should even apply to an RSA chapter 485-C case, and argues that even if it were applicable, it is distinguishable because this case is more like *Morgenstern v. Town of Rye*, 147 N.H. 558 (2002). Assuming without deciding that *Fisher*'s reasoning could be extended to this case, we agree with USA Springs that *Morgenstern* is more factually analogous. In *Morgenstern*, we vacated the upholding of a zoning board's refusal to consider a second variance application on the authority of *Fisher*. *Morgenstern*, 147 N.H. at 565, 567. We noted that "[u]nlike the defendant in *Fisher v. Dover*, the plaintiff did not merely resubmit substantially the same application for a variance, but, at the town's invitation, submitted a new proposal in an

effort to meet the town's concerns." *Id.* at 566. Similarly, in this case, USA Springs' new application supplemented its prior one in response to comments made by DES in denying the prior application. It was therefore not "substantially the same application." *Id.*

*VII. Conclusion*

For the foregoing reasons, we affirm DES' issuance of a large groundwater withdrawal permit to USA Springs. We note that our decision is based upon the statutory language in force at the time of DES' decision; to the extent that the statutory language upon which we rely remains in force, the legislature is free to amend it if it disagrees with our construction.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.