NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2021-0214

TRANSFARMATIONS, INC.

v.

TOWN OF AMHERST

Argued: March 15, 2022
Opinion Issued: November 30, 2022


Donahue, Tucker & Ciandella, PLLC, of Exeter (Brendan Avery O'Donnell and John J. Ratigan on the brief, and Brendan Avery O'Donnell orally), for the plaintiff.


Cronin, Bisson, & Zalinsky, PC, of Manchester (Christopher B. Drescher on the brief and orally), for the defendant.


Cronin, Bisson, & Zalinsky, PC, of Manchester (Daniel D. Muller, Jr.), for the intervenors, filed no brief.


HICKS, J. The plaintiff, TransFarmations, Inc. (TransFarmations), appeals a decision of the Superior Court (Anderson, J.) upholding decisions of

the planning board for the defendant, the Town of Amherst (Town), denying TransFarmations' two successive applications for a conditional use permit (CUP).  We reverse and remand.

The following facts were recited in the trial court's order or relate the contents of documents in the record.  In May 2019, TransFarmations requested a "Conceptual Meeting" with the Town's planning board (Board) concerning its proposed development of an approximately 130-acre property known as the Jacobson Farm.  TransFarmations called the proposed development the "Jacobson Farm Agrihood" and explained that "[t]he intention is to have about 75% of the site preserved as open space with farming and forests as central features."  It further stated that the "development will be designed to meet many of the desired attributes the Town . . . has articulated in [its] Master Plan and [Integrated] Innovative . . . Housing Ordinance (IIHO)," including workforce housing and over-55 housing.

According to the Town Planner's staff report, the IIHO became part of the Town's zoning ordinance in 2015.[1]  The staff report further explains that in meeting minutes discussing the IIHO's intent, "it was noted that [the IIHO] provides one integrated ordinance with incentives for affordable housing, senior housing and [planned residential developments].  The ordinance is based upon what density you are eligible for by right in the underlying zoning district and provides bonuses for the innovative uses and proposed amenities."  (Quotation omitted.)

TransFarmations subsequently submitted a CUP application under the IIHO for a planned residential development containing 64 residential units.  A public hearing on the application was held on December 4, 2019, at which TransFarmations' representative, Ken Clinton, asserted that the application met the CUP criteria contained in Section 3.18(C) of the Town's zoning ordinance, including subsection (C)(1)(c).  That provision requires the applicant to establish that "there will be no significant adverse impacts resulting from the proposed use upon the public health, safety, and general welfare of the neighborhood and the Town."  Clinton explained:

> [T]he project will be controlled by regulatory authority.  It will feature state approved septic designs, water brought in from Pennichuck Water, lower farm pollutants due to best management practices (where there are none currently), and low and net zero objectives.  Everything on site will be well-engineered and designed and based on town and state regulations.  For the upcoming traffic study, a consultant is being considered to work jointly with this

---

[1] The IIHO has since been repealed.

proposal and another current proposed development in town, in order to get joint data that can be extrapolated to show how each affect traffic singularly and together.

The Board then heard comments from members of the public, several of whom mentioned concerns about traffic. The Board discussed whether to table the application to a future date, with member Hart stating that he had "concerns regarding [section 3.18(C)(1)(c)] due to the traffic study not yet being complete." Ultimately, the Board voted, four to two, to deny the application.

The Board members voting to deny the application gave the following reasons. Member Coogan "stated that he doesn't understand the project and how there is a benefit to the town to deserve the requested [density] bonuses." Member Rosenblatt stated that he did not "believe the applicant sustained the burden of proof in this case," specifically by failing to satisfy section 3.18(C)(1)(b), which requires the proposal to meet "the purposes of the ordinance under which the application is proposed," and by failing to satisfy section 3.18(C)(1)(c) "with regard to lack of adverse impact." Member Harris stated that he "side[d] with" Rosenblatt, and Hart voted to deny the application "based on his previous explanation." In addition, non-voting, alternate member Houpis voiced concerns about "the pitch of the proposed road, increased drainage, runoff, grazing, traffic volume, financial viability, and a lack of Amherst-specific data." After the vote was taken, member Dell Orfano, who had not voted due to his position as Board chair, stated that "the applicant can reapply for a CUP with more information."

The Board issued its decision on December 5. The reason given for denial was that "[t]he applicant did not meet the[] burden of proof for Section 3.18 C.1.c. that there would be no significant adverse impact resulting from the proposed use upon the public health, safety, and general welfare of the neighborhood and the Town of Amherst." TransFarmations appealed the denial to the superior court. See RSA 677:15 (2016).

TransFarmations submitted a revised CUP application under the IIHO on December 13, 2019. A public hearing on the application was noticed for July 7, 2020 with the following explicit qualification:

This hearing will be limited in scope to only the issue of whether the application and plan submitted in the . . . [case] is sufficiently different from the first application in the same matter to avoid preclusion of the Planning Board's review under the Fisher v. Dover and CBDA Development, LLC[] v. Town of Thornton holdings.

(Bolding omitted.) See Fisher v. City of Dover, 120 N.H. 187 (1980); CBDA Dev., LLC v. Town of Thornton, 168 N.H. 715 (2016). Prior to the public

3

hearing, TransFarmations' attorney asserted in a letter to the Board that there were "multiple material changes" in the revised application as compared to the previous application that the Board had denied. In addition, TransFarmations submitted a 43-page traffic study containing an additional 278 pages of appendices.

At the public hearing, several members of the public voiced continued concern about traffic, among other things. Board member Stoughton opined that the two applications were not materially different with respect to density and that the Board's concerns about traffic and safety had not been sufficiently addressed. Board member Coogan expressed his belief that the applications were not materially different because it appeared that relatively the same number of residents would occupy the units. Board member Dokmo noted that TransFarmations had not addressed "the total number of bedrooms proposed or the amount of the site proposed to be disturbed." Board member Brew also did not find the applications to be sufficiently different, stating that he did not "see that the concerns voiced the last time were addressed in this application, even with the additional supplied data." Board member Houpis failed to see "relevant substantive changes and material differences" in the revised application "address[ing] the issues that caused the first application to be rejected."

Following its discussion, the Board voted, again splitting four to two, that the revised application did not materially differ from the first. Notice of that decision issued on July 27, and TransFarmations appealed the decision to the superior court. The trial court consolidated the two appeals.

TransFarmations challenged the December 2019 decision on the ground that it violated RSA 676:4, I(h), which provides: "In case of disapproval of any application submitted to the planning board, the ground for such disapproval shall be adequately stated upon the records of the planning board." RSA 676:4, I(h) (2016). The trial court "recognize[d] that the Board's minutes are not quite as clear as one might hope," but concluded that when the "entire record of the Board's minutes . . . [is] read in conjunction with the Board's notice of denial, . . . the Board adequately stated its ground for disapproval upon the record."

In its challenge to the July 2020 decision, TransFarmations argued both that the decision failed to adequately state the ground for denial and that the Board acted unreasonably because the second CUP application was materially different from the first. The trial court concluded that the Board adequately provided the reason for the July 20 decision on the record because "the Board members discussed, in detail, their reasons for concluding that no material differences [between the first and second applications] existed." The court also concluded that "the Board acted reasonably and lawfully in reaching [that]

4

decision." Accordingly, the court affirmed both of the Board's decisions. TransFarmations unsuccessfully moved for reconsideration, and this appeal followed.

The trial court's review of a planning board's decision is governed by RSA 677:15. Girard v. Town of Plymouth, 172 N.H. 576, 581 (2019); RSA 677:15. That statute provides that the trial court "may reverse or affirm, wholly or partly, or may modify the decision brought up for review when there is an error of law or when the court is persuaded by the balance of probabilities, on the evidence before it, that [the board's] decision is unreasonable." RSA 677:15, V. The trial court's review is limited. Girard, 172 N.H. at 581. It "must treat the factual findings of the planning board as prima facie lawful and reasonable and cannot set aside its decision absent unreasonableness or an identified error of law." Id. "The appealing party bears the burden of persuading the trial court that, by the balance of probabilities, the board's decision was unreasonable." Id. "The trial court determines not whether it agrees with the planning board's findings, but whether there is evidence upon which its findings could have reasonably been based." Id.

This court's review is similarly limited. Id. "We will reverse a trial court's decision on appeal only if it is not supported by the evidence or is legally erroneous." Id. "We review the trial court's decision to determine whether a reasonable person could have reached the same decision as the trial court based upon the evidence before it." Id. at 582.

TransFarmations argues that the trial court erred on a number of grounds in affirming both the December 2019 and July 2020 decisions. At oral argument, however, its counsel indicated that if this court reversed the trial court's affirmance of either decision, TransFarmations would proceed on the corresponding CUP application, which would effectively render the other CUP application moot. Accordingly, because we agree with TransFarmations that the trial court erred in affirming the Board's decision that the second CUP application did not materially differ from the first, we need not address its remaining arguments.

"It is well settled that a [planning] board, having rejected one [land use] application, may not review subsequent applications absent a 'material change of circumstances affecting the merits of the application.'" Brandt Dev. Co. of N.H. v. City of Somersworth, 162 N.H. 553, 556 (2011) (quoting Fisher, 120 N.H. at 191); see CBDA Dev., LLC, 168 N.H. at 723. In the seminal case of Fisher v. City of Dover, we held, with respect to a variance application to a zoning board of adjustment:

> When a material change of circumstances affecting the merits of the application has not occurred or the application is not for a use that materially differs in nature and degree from its

5

predecessor, the board of adjustment may not lawfully reach the merits of the petition. If it were otherwise, there would be no finality to proceedings before the board of adjustment, the integrity of the zoning plan would be threatened, and an undue burden would be placed on property owners seeking to uphold the zoning plan.

Fisher, 120 N.H. at 188, 190. Subsequently, in CBDA Development, LLC, we held "that the subsequent application doctrine set forth in Fisher [also] applies in the planning board context." CBDA Dev., LLC, 168 N.H. at 723.

"The determination of whether changed circumstances exist is a question of fact which necessitates a consideration of the circumstances which existed at the time of the prior denial," Fisher, 120 N.H. at 190-91 (quotation omitted), and "[t]his determination must be made, in the first instance, by the Board," CBDA Dev., LLC, 168 N.H. at 724. "[A]n applicant before a planning board bears the burden of demonstrating that a subsequent application materially differs in nature and degree from its predecessor." Id. (quotation omitted).

TransFarmations contends that the trial court erred in affirming the Board's decision not to accept the second application because TransFarmations submitted that application "at the Board's invitation and with the information the Board requested." It contends that Dell Orfano, the Board's chair, "expressly invited a revised application with more information, i.e., a completed traffic study." Our post-Fisher cases recognize that "[e]vidence of an invitation to submit a modified application to meet an agency's concerns . . . acts as additional evidence that a subsequent application so modified is materially different." Appeal of Allen, 170 N.H. 754, 762 (2018). As we explained in Hill-Grant Living Trust v. Kearsarge Lighting Precinct, 159 N.H. 529 (2009), "it is logical to presume that if the [board] invites submission of a subsequent application modified to meet its concerns, it would find an application so modified to be materially different from its predecessor, thus satisfying Fisher." Hill-Grant Living Trust, 159 N.H. at 536.

The Town disagrees with TransFarmations' characterization of Dell Orfano's statement. It contends that Dell Orfano's statement "was not a direct invitation," but rather, "is standard after any kind of a denial advising the Applicant of their rights and was not a 'Board Invitation.'" Even assuming, as the Town contends, that the meaning of Dell Orfano's statement depends to any extent upon whether such a statement from a planning board chair "is standard after any kind of a denial," here the Town cites nothing to support its assertion that such statements are, in fact, standard. Moreover, an express invitation is not required. As we said in CBDA Development, LLC, "Fisher does not preclude consideration of a subsequent application — explicitly or

6

implicitly invited by a . . . board — which has been modified to address the board's concerns about the initial application." CBDA Dev., LLC, 168 N.H. at 724. Therefore, we reject the Town's argument.

Nevertheless, the Town argues that Dell Orfano's statement neither "mention[s] any requirement for a traffic study" nor "contains . . . [any] directive to . . . provide a traffic study." Again, we disagree with the Town's characterization of the statement. Dell Orfano invited TransFarmations to "reapply . . . with more information." (Emphasis added). The only "information" mentioned by any voting Board member as missing from the first application was a traffic study. Accordingly, we agree with TransFarmations that the Board "expressly invited a revised application with more information, i.e., a completed traffic study."

The Town contends, however, that even with the completed traffic study, "the Board need not [have] move[d] forward" with the revised application, because "the traffic report confirmed [the Board's] fears relative to traffic and safety." In other words, the Town's argument defends the trial court's findings that "the Board considered the traffic study but did not agree with the expert's conclusion that the project would not have an adverse impact on traffic in the neighborhood" and that "a reasonable person could have concluded that the traffic study did not address or alleviate the Board's previously articulated concerns about traffic." In turn, it defends the court's finding "that Petitioner's failure to resolve the Board's concerns about traffic is enough, on its own, to justify the Board's conclusion that the revised application was not materially different."

The Town relies upon our statement in CBDA Development, LLC that "before accepting a subsequent application under the Fisher doctrine, a board must be satisfied that the subsequent application has been modified so as to meaningfully resolve the board's initial concerns." Id. at 725. However, CBDA's subsequent application was not significantly modified to address one of the "two basic reasons" that the board noted for its denial. Id. at 718 (quotation omitted). Specifically, CBDA's subsequent campground application still allowed an overwhelming majority of the campsites to be occupied "with a greater amount of permanency than what is intended in the Thornton Campground Regulation and State statutes." Id. at 725-26 (quotation omitted).

In the instant case, the trial court found that "the Board's denial of TransFarmations' first application was due, in large part, to concerns about traffic." Nevertheless, the articulated reason for the denial was that "[t]he applicant did not meet the[] burden of proof for Section 3.18 C.1.c. that there would be no significant adverse impact resulting from the proposed use upon the public health, safety, and general welfare of the neighborhood and the Town of Amherst." In reviewing the initial application, a Board member identified the incomplete traffic study as an impediment to the Board's review.

7

The Board chair's express statement invited TransFarmations to reapply with "more information," which, as we conclude above, meant supplying a completed traffic study. Although unresolved "concerns" about traffic may have led the Board to decide that TransFarmations had not met its burden of proof with respect to Section 3.18(C)(1)(c), neither the Board's December 2019 decision nor its invitation to reapply identified any deficiency in the original application other than the lack of a completed traffic study. In other words, the Board did not find that, in fact, the project would have a significant adverse impact on traffic, but rather, that it required more information to understand the actual effect of the proposed use on traffic before determining whether modifications would be required to resolve its "concerns" about traffic.

The determination whether a successive application is materially different from the former application is a step preliminary to consideration of the merits of the revised application. See Brandt Dev. Co. of N.H., 162 N.H. at 557 (noting that the board must determine "as a threshold matter whether a material change of circumstances has occurred and whether full consideration is therefore required"). It is during that "full consideration" that the application with the additional information may be evaluated for satisfaction of the applicable CUP criteria, either as submitted or as modified during the planning process based on input from the board.

A review of our successive application cases demonstrates that what constitutes a "material difference" in such cases turns upon the identified deficiencies in the initial application and the terms of the invitation to reapply. In our first post-Fisher case addressing successive reapplication, we noted that throughout the litigation in that case, the town had "taken the position that it denied the plaintiff's request for a variance because of concerns about the particular proposed structure's impact on the wetlands." Morgenstern v. Town of Rye, 147 N.H. 558, 564–65 (2002). In addition, in its pleadings submitted to the trial court, "the town essentially invited the plaintiff to file a new variance application, stating, '[T]he applicant has provided no evidence that a smaller house and/or a house that did not require filling wetlands could not be built on the lot, thereby addressing the [zoning board of adjustment's] concern.'" Id. at 566. On those facts, we concluded that "[u]nlike the defendant in Fisher v. Dover, the plaintiff did not merely resubmit substantially the same application for a variance, but, at the town's invitation, submitted a new proposal in an effort to meet the town's concerns." Id. at 566.

Similarly, in Hill-Grant Living Trust, the plaintiff sought, and was denied, a variance from "a zoning ordinance that prohibit[ed] the building of any structure more than 900 feet above sea level." Hill-Grant Living Trust, 159 N.H. at 531. The plaintiff then brought an action alleging inverse condemnation by regulatory taking. Id. The trial court granted summary judgment to the defendant on the ground that the taking claim was premature, and we affirmed. Id. We concluded that "the submission of a new variance

8

application would not have been futile," id. at 538, noting statements by various zoning board members, including that, "if the applicant came back with a specific location, [the member] could see granting a variance on that specific location," and that, although "the applicant is asking to build anywhere on the lot, . . . if the applicant resubmits with a certain elevation, the Board may grant a [v]ariance," id. at 536 (quotations omitted).

The scope of the actual or hypothetical revisions in Morgenstern and Hill-Grant Living Trust directly corresponded to the identified deficiencies that resulted in the initial denial. See Morgenstern, 147 N.H. at 566; Hill-Grant Living Trust, 159 N.H. at 537. Although the revisions discussed in Morgenstern and Hill-Grant Living Trust involved or contemplated changes to the proposed project, changes of that scope are not required by the Fisher doctrine itself: When a denial identifies a lack of information as the deficiency in the initial application, we have held that a reapplication proposing a project substantially identical to the prior proposed project is materially different under Fisher if the new application provides the information missing from the prior application. In Appeal of Town of Nottingham, 153 N.H. 539 (2006), for example, the New Hampshire Department of Environmental Services (DES) denied an application for a large groundwater withdrawal permit. Appeal of Town of Nottingham, 153 N.H. at 542. The applicant then submitted a second application, relying on information already on file with DES as well as subsequently submitted material. Id. at 542–43. DES approved the subsequent application. Id. at 543.

On appeal, one of the parties challenging that approval argued that to the extent that the second application was "a resubmission of the already denied application, based on no change in events, [DES's] approval of the application was contrary to Fisher." Id. at 565 (quotation omitted). "Assuming without deciding that Fisher's reasoning could be extended to" an application to DES, we disagreed. Id. Instead, we agreed with the applicant that the case was more analogous to Morgenstern than Fisher. Id. We concluded that the applicant's "new application supplemented its prior one in response to comments made by DES in denying the prior application. It was therefore not substantially the same application." Id. at 566 (quotation omitted). In particular, although DES denied the first application because it did "not contain all of the information required by Env–Ws 388.17," DES noted that the applicant "subsequently complied with the requirements of Env–Ws 388 by submitting supplemental information after" the first denial. Id. at 563 (emphases added). Thus, we viewed DES's comments regarding information lacking in the first application as identifying a deficiency and concluded that a subsequent application supplemented with that information was "not substantially the same application" under Fisher. Id. at 566 (quotation omitted).

9

Here, as in <u>Appeal of Town of Nottingham</u>, the Board identified a lack of information as the deficiency in the initial application. Accordingly, we conclude that TransFarmations' second application supplying the requested information was "materially different from its predecessor, thus satisfying <u>Fisher</u>." <u>Hill-Grant Living Trust</u>, 159 N.H. at 536. Because the trial court's decision concluding otherwise misapplied our <u>Fisher</u> jurisprudence, it is legally erroneous. Accordingly, we reverse the trial court's order as to the July 2020 decision and remand.

<u>Reversed and remanded</u>.

MACDONALD, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.